In re Bernard W. CERAR and Monique M. Cerar, Debtors.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of the Atkinson Trust & Savings Bank, Plaintiff–Appellee,**

v.

Bernard W. CERAR and Monique M. Cerar, Defendants–Appellants.

No. 88–4051.

United States District Court,
C.D. Illinois,
Rock Island Division.

Feb. 22, 1989.

Dale G. Haake, Katz, McAndrews, Durkee, Balch & Lefstein, Rock Island, Ill., for plaintiff-appellee.

Mark Tarnow, VanDerKamp, Cleaver & Stojan, P.C., Rock Island, Ill., for defendants-appellants.

### ORDER

MIHM, District Judge.

The Federal Deposit Insurance Corporation (FDIC) brought an adversarial action in the bankruptcy court against Bernard and Monique Cerar, seeking to prevent the discharge of a note. The bankruptcy court ruled for the FDIC on Counts I and II.

That decision, appealed to this Court, is hereby AFFIRMED.

## FACTS

The Atkinson Trust & Savings Bank was closed on November 22, 1983 by order of the Commissioner of Banks and Trust Companies of the State of Illinois, because of findings that the capital of the Bank was impaired, the Bank was in unsound condition, and the Bank's business was being conducted in an unsafe manner. The Federal Deposit Insurance Corporation (FDIC) was appointed receiver. The FDIC promptly entered into an agreement with another Bank for the sale of certain assets of the Atkinson Bank. The new Bank opened shortly thereafter.

The FDIC proceeded to collect on the remaining assets of the Bank. Among these assets was a promissory note in the amount of $33,400 in the name of Mark Cerar, admittedly forged by Bernard Cerar. Bernard Cerar testified that he forged the promissory note in cooperation with Bank officials when it was discovered he was over his legal lending limit by $33,400. The forged note was allegedly used by the Bank officers to replace the original $33,400 note so that the Bank examiners would not determine the "overline" loan situation with respect to Bernard Cerar.

Bernard and Monique Cerar filed for bankruptcy in 1984. The FDIC challenged the dischargeability of the forged note in a four count adversarial action instituted in the bankruptcy court. Judgment was entered in favor of the FDIC on Count I (11 U.S.C. § 523(a)(2)(A), false pretenses, false representation or actual fraud) and on Count II (11 U.S.C. § 523(a)(6), willful and malicious injury). 84 B.R. 524. The court ruled against the FDIC on Count III, and Count IV was withdrawn. The Debtors have appealed from the decisions on Counts I and II. No appeal has been taken from the dismissal of Count III.

## COUNT I

11 U.S.C. § 523(a)(2)(A) provides that: A discharge under ... this title does not discharge an individual debtor from any debt ... (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud.

To prevail on a claim that a debt is non-dischargeable because of false representations as to matters other than financial condition, the creditor must prove by clear and convincing evidence (1) that the debtor made a representation, (2) that the representation was materially false, (3) that the debtor knew the representation was materially false, (4) that the representation was made with the intent and purpose of deceiving the creditor, (5) that the creditor relied on the representation, and (6) that money, property, or services or an extension, renewal, or refinancing of credit was obtained as a result of the false representation. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985).

The record shows that the first four elements have been established. Cerar intentionally and knowingly gave a forged note to the Bank. Cerar knew that Bank officers would use his forged note to deceive the Bank examiners, and ultimately the FDIC, by hiding the violation of the legal lending limit in Cerar's portfolio. The bankruptcy court's finding that "he gave the forged note with that purpose in mind" is not clearly erroneous.

The two remaining elements, reliance and extension of credit, are in dispute. The bankruptcy court found that both elements had been met, while Cerar contends there was neither reliance nor an extension of credit.

Under 12 U.S.C. § 1811, the FDIC is to provide deposit insurance for participating banks. In order to be insured a bank must be examined either by the FDIC or by another regulatory authority upon whom the FDIC may legally rely. 12 U.S.C. §§ 1814, 1815. Banks are periodically re-examined to determine whether deposit insurance is to be continued. The FDIC may examine a bank itself; it may have access to the reports of examinations by the comptroller of currency or any federal reserve bank, to all reports of condition made by

the bank, to all revisions of those reports, and it may accept reports or examinations made by state banking authorities. 12 U.S. C. § 1817(a)(2)(A).

If, pursuant to these examinations or reports, the FDIC determines that a bank is engaging in unsafe or unsound practices, the FDIC may terminate deposit insurance under 12 U.S.C. § 1818(a). However, banks are usually not closed by the FDIC but rather by state banking authorities, who may or may not appoint the FDIC as the closed bank receiver. When the FDIC is offered a receivership, the FDIC is obligated to accept under 12 U.S.C. § 1821(e).

The FDIC may obtain a purchaser for the bank's assets or may act as a receiver. In either case, the FDIC is required to perform a cost test under § 1823(c)(4)(A) in order to determine quickly the best method of liquidating the assets of the bank with the least risk to the deposit insurance fund. In other words, the FDIC may close the bank and completely liquidate it, or it may purchase all of the bank's assets, or it may perform a combination of the two (as was the case here).

The purpose for FDIC intervention in the banking industry is the absolute necessity of protecting the stability and integrity of the banking system. Thus, the FDIC has the dual relationship of creditor or potential creditor and of supervisory authority toward those banks which are insured.

■ Normally the existence of the element of reliance which must be established in order to prevent discharge of a debt depends upon whether the creditor actually relied on the debtor's representation when loaning money or providing services. However, the situation is different where the debtor's fraud was performed in conjunction with his creditor for the purpose of deceiving banking examiners and ultimately the FDIC.

In the leading case of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that the FDIC is entitled to rely on the written records of the bank as a matter of law. In *D'Oench*, bank officers and a bank customer had an unwritten agreement that a note, proper in all other respects, would not be enforced against the customer. The bank was subsequently closed and the FDIC was appointed the receiver. When the FDIC attempted to collect on the note, the customer raised the unwritten agreement as a defense. The FDIC, on the other hand, argued that the petitioner was estopped to argue a personal defense because the note was executed in order to misrepresent to the creditors of the bank, state banking authorities, and the FDIC the condition of the bank and because the petitioner had participated in the misrepresentation.

The Supreme Court held that there was a federal policy to protect the FDIC and the public funds which it administers against misrepresentations as to the assets of insured banks. A personal defense is not allowed where the act of an accommodation-maker contravenes the general policy of protecting the institution of banking from such secret agreements, irrespective of whether the accommodation-maker was a party to the scheme of deception or had no positive idea of committing a fraud. The Court stated that the test was whether the note was designed to deceive the creditors of the public authority or would tend to have that effect.

The decision in *D'Oench* relied on two prior cases, *Deitrick v. Greany*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), and *Mt. Vernon Trust Co. v. Bergoff*, 272 N.Y. 192, 5 N.E.2d 196 (Ct.App.N.Y.1936). In *Deitrick*, the defendant wished to conceal a bank's acquisition of its own stock so he had a strawman hold the shares and executed a note to the bank. The bank and the defendant agreed that the shares were to be held for the bank and that the defendant would not be liable on the note. The Supreme Court held, as a matter of federal law based upon the policy of the National Banking Act to prevent the impairment of a bank's capital resources by prohibiting such acquisitions, that the defendant could not rely on his own wrongful act to defeat the obligation of the note as against the receiver of the bank.

In *Mt. Vernon Trust*, the court stated:

The defendant may not have intended to deceive any person, but when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank, executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced. 5 N.E.2d at 196.

Subsequent to *D'Oench,* Congress passed the Federal Deposit Insurance Act of 1950. Within that Act, the *D'Oench* doctrine as it applies to the FDIC in its corporate capacity was codified. Section 1823(e). In other words, when the FDIC sues directly on a note or other asset of a bank, the *D'Oench* doctrine has been codified.

The FDIC in the case at bar was acting as a receiver and not in its corporate capacity. The debtors in the case at bar argue that the *D'Oench* decision has been completely replaced by § 1823(e) and that the FDIC, unless it is acting in its corporate capacity, must therefore prove that it reasonably relied on the note. The bankruptcy court held that *D'Oench* still controls where the FDIC acts as a receiver, so that, as a matter of law, the FDIC was entitled to rely on the bank's written records and was not required to prove actual reliance.

The debtors have cited no cases to support their position that the *D'Oench* doctrine does not apply when the FDIC is acting as a receiver. The Seventh Circuit has not ruled on this issue. However, in *FDIC v. McClanahan,* 795 F.2d 512, the Fifth Circuit discussed the *D'Oench* doctrine and found that it does apply to the FDIC in its capacity as a receiver. The court stated that in *D'Oench,* the FDIC had sued in its corporate capacity. The Supreme Court, however, in that case relied on *Deitrick v. Greany,* a case involving a receivership. The Court gave no indication that the rule would be applied differently

depending upon the capacity in which the FDIC was acting. The Fifth Circuit further noted that the legislative history of § 1823(e) does not mention the *D'Oench* doctrine at all and that there is no reason to suppose that Congress intended to forbid the rule of estoppel from being applied when the FDIC sues as a receiver. *McClanahan,* 795 F.2d at 514 n. 1.

Most of the cases discussing the *D'Oench* doctrine, however, deal with situations in which the FDIC is suing in its corporate capacity, thus bringing into play the literal language of § 1823(e). Section 1823(e) is not controlling in the case before the Court. In this case, where the FDIC was acting in its capacity as a receiver, the Court finds the reasoning in *McClanahan* persuasive and thus holds that the common law *D'Oench* doctrine is controlling. "The result, though not the analysis, is the same." *McClanahan,* 795 F.2d at 516.

When the FDIC acts as a receiver, victory for the debtor ordinarily will mean a loss that is shared by uninsured creditors and depositors of the failed bank. Where the debtor acted in complicity with the bank to deceive the bank examiners, it appears to be the better policy to require that the debtor bear the consequences rather than the innocent depositors or creditors of the failed bank. Because the Debtors have cited no policy reasons and no case law to indicate that the common law *D'Oench* doctrine of estopping a debtor from using his own misconduct to defend against the FDIC as receiver should be replaced by some other policy, the bankruptcy court is affirmed in its finding that the FDIC was entitled to rely as a matter of law on the written records of the Bank.

■ The debtors also argue that under § 523(a)(2)(A) there was no extension of credit. The bankruptcy court, on the other hand, held that forbearance of collection efforts constituted an extension of credit within the meaning of the Bankruptcy Code governing dischargeability on the basis of fraud.

There are two lines of cases which are cited by the parties and the judge to support or refute the proposition that forbear-

ance is an extension of credit. *In re Field*, 44 B.R. 322 (Bkrtcy.S.D.Fla.1984); *In re Schmidt*, 70 B.R. 634 (Bkrtcy.N.D.Ind. 1986); *In re Batcher*, 47 B.R. 825 (Bkrcy.E.D.Pa.1985); *In re Colasante*, 12 B.R. 635 (Bkrcy.E.D.Pa.1981). All of these cases, however, are so factually dissimilar to the case at bar that none can be deemed controlling. Most importantly, in none of these cases was the debtor's fraud committed with the knowledge and complicity of the original creditor. Furthermore, in none of the cases is any authority cited which is binding on this court nor is any argument presented which is persuasive in the fact situation in the case at bar.

Independent research has turned up no forbearance cases with facts even remotely approaching the facts at issue here. Indeed, it is difficult to characterize what happened. The debtor argues that there is no evidence in the record of any forbearance because there was no extension or forbearance that arose out of the second note. On the other hand, it appears (but is not directly stated by the parties) that if the fraudulent second note had not been signed and the bank examiners had discovered the Cerars' overextension of credit, the Bank would have been forced to foreclose on the $33,400. In essence, the fraudulent note made it possible for the debtor to retain the $33,400 in spite of the legal limit on his borrowing. In that sense, the Bank agreed to put the debtor in a position whereby no foreclosure would occur. Surely this set of facts falls within the statutory definition of an extension of credit.

■ The analysis might be different if the facts indicated that the FDIC listed both notes as assets when they took receivership of the Bank. However, this is not the case. When the forged note was entered into the records of the Bank, the other note no longer showed, and it is not listed as an asset of the Bank by the FDIC. Cerar clearly retained a financial benefit to which he was not entitled as a result of the forged note. In that sense, credit was extended or renewed as a result of the misrepresentations. The bankruptcy judge's finding that there was a tacit agreement that the Bank would forego collection efforts and that this forebearance was an extension of credit under § 523(a)(2)(A) is affirmed.

Accordingly, this Court agrees with the bankruptcy court that all the elements under § 523(a)(2)(A) were established.

## COUNT II

■ Count II of the complaint was brought under § 523(a)(6) for willful and malicious injury. In order to establish a case under this section, the FDIC must prove three elements: (1) a willful and malicious act, (2) done without cause or excuse, and (3) which leads to harm. *See, Matter of DeVier*, 57 B.R. 602 (Bkrcy.E.D. Mich.1986).

■ The debtor does not dispute the bankruptcy court's finding that his action was willful but contends that it was not malicious. The bankruptcy court recognized that there are two lines of authority as to the legal standard for deciding what is a malicious act. One line requires an actual conscious intent to financially injure the creditor. *See, In re Mettetal*, 41 B.R. 80 (Bkrcy.1984). The other line adopts a less stringent standard of implied or constructive malice holding that where an act is deliberately and intentionally done with knowing disregard for the rights of another it falls within the statutory definition of malice even if there is an absence of malice toward the particular creditor. *See, United Bank of Southgate v. Nelson*, 35 B.R. 766 (D.C.1983).

The Seventh Circuit has not set forth the proper standard for malice in the context of this section. The bankruptcy court concluded that the less strict definition of malice as found in *United Bank of Southgate* is the better analysis. Accordingly, the court found that, because the debtor knew that the bank was subject to FDIC examination and that the forged note would be used to conceal his credit situation from bank examiners, and because the debtor proceeded in the face of that knowledge to deliberately and intentionally forge the note, his action was therefore malicious.

Section 523(a)(6) is closely related to § 17 of the old Bankruptcy Code which excepted from discharge liabilities "for willful and malicious injuries to persons or property of another," later amended to provide for willful and malicious conversion of the property of another. The "willful and malicious injury" exception of the old Act was interpreted by the Supreme Court in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). In *Tinker,* the Supreme Court ruled,

> We think a willful disregard of what one knows to be his duty, an act which is against morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* at 477, 24 S.Ct. 505. In defining "malicious," the Court allowed constructive or implied malice, repeatedly denying any requirement of special intent. "A malignant spirit or a specific intention to hurt a particular person is not an essential element." *Id.* at 477, 24 S.Ct. 505. *See, United Bank of Southgate,* 35 B.R. at 769.

The split in authority regarding the proper interpretation of "malicious" under § 523(a)(6) stems from official congressional comments accompanying this section which indicate that *Tinker* was to some extent being overruled. "Under this paragraph willful means deliberate or intentional to the extent that *Tinker v. Colwell* held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a reckless disregard standard they are overruled." Sen.Rept. No. 95–989, 95th Cong., 2d Sess. (1978); 77–79 U.S.Code Cong. & Admin. News 1978, 5787, 5864; cited in *United Bank of Southgate,* 35 B.R. at 770. Early court interpretations of § 523(a)(6) read the legislative record to entirely obviate *Tinker.*

However, a more recent line of cases places less emphasis on the legislative record and continues to allow malice to be established through implied or constructive malice. See citations in *United Bank of Southgate,* 35 B.R. at 770. The more recent cases applying the constructive malice standard have used various forms of analysis in order to conform with this quotation from legislative history. These approaches are summarized in *United Bank of Southgate, Id.* at 770–74. The approach which seems most logical is that employed in *In re Fussell,* 15 B.R. 1016 (W.D.Va.1981), where the court noted that the holding in *Tinker* was a dual one, defining both willful and malicious. The legislative history demonstrates an intent by Congress only to overrule *Tinker* in its definition of "willful," not to alter statutorily the *Tinker* definition of "malicious."

The bankruptcy court found that the FDIC in this case had proven by clear and convincing evidence that the forgery of the note was done deliberately, intentionally, and in knowing disregard of the rights of another and was therefore malicious conduct. This holding is certainly not erroneous. Accordingly, the bankruptcy court's finding of implied or constructive malice is affirmed.

Cerar also argues that his actions were not "done without cause or excuse" because he was coerced into forging the note under the Bank's threat of foreclosure. If the Debtor had been able to establish that duress was indeed present then the note would be unenforceable.

The Illinois Supreme Court in *Kaplan v. Kaplan,* 25 Ill.2d 181, 182 N.E.2d 706 (1963), discussed the defense of duress as follows:

> Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will, and it may be conceded that a contract executed under duress is voidable.... Under modern view ... duress is no longer confined to situations involving threats of personal injury or imprisonment, and the standard of whether a man or ordinary courage would yield to the threat has been supplanted by a test which inquires whether the threat has left the individual bereft of the quality of mind essential to the making of a contract.... The threat must be of such nature and

made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect, and the act sought to be avoided must be performed by the person while in that condition.... It is well established that it is not duress to institute or threaten to institute civil suits, or for a person to declare that he intends to use the courts to insist upon what he believes to be his legal rights, at least where the threatened action is made in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process.

*Id.* at 185–86, 182 N.E.2d 706. (Citations deleted).

The bankruptcy court found that the evidence presented did not justify a finding of duress. There was no proof of control over the debtor's will nor was there proof that he was rendered bereft of a quality of mind necessary to make a contract. Furthermore, there was no proof that the foreclosure was not a legal right possessed by the Bank or that the foreclosure would constitute an abuse of process.

The debtor also relied upon the fact that he attempted to rescind his forged note by contacting officers of the Bank through his attorney. However, his attorney and he made no attempt to contact the Bank examiners or the FDIC. The bankruptcy court held that his failure to notify the examiners was an act which ratified and perpetrated the deception.

Despite some evidence in the transcript which reveals that the debtor felt he had a just cause or reason for having forged the note, the Court agrees with the bankruptcy court that the FDIC established by clear and convincing evidence that there was no legally cognizable cause or reason for Cerar's forgery of the note.

There is also no doubt that Cerar's action led to harm to the FDIC. The purpose of bank regulations which establish lending limits to any one borrower is to protect the bank from lending excessive funds to any one borrower, so that in the event the borrower fails to repay, the bank will not be placed in financial difficulty. The FDIC insures deposits so that depositors will be paid in the event that the bank fails. When Cerar forged the note which permitted the Bank to continue to retain the excess loans on its books, a situation of potential harm was created for both the Bank and the FDIC. This potential came to fruition when the Bank failed and the FDIC was forced to take over the Bank. Cerar's actions clearly contributed to the failure of the Bank, although they were not the sole cause, and they were clearly of the type which the regulation was intended to prohibit.

The debtor attempts to raise the issue of the FDIC's knowledge of the forged note to contradict the FDIC's allegation of harm. In other words, if the FDIC knew of the forgery at the time it acquired the note, then it cannot allege any harm. In *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987), the Supreme Court stated:

harm to the FDIC (and those who rely upon the solvency of its fund) is not avoided by knowledge at the time of acquiring the note.... The FDIC is an insurer of the bank, and is liable for the depositors' insured losses whether or not it decides to acquire the note. The harm to the FDIC ... occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measure, including termination of the bank's deposit insurance.... Thus, ... the state of the FDIC's knowledge at that time is what is crucial.

Although *Langley* is a case interpreting § 1823(e) and not § 523(a)(6), there is no reason to distinguish knowledge when the FDIC is seeking payment directly on a note under § 1823 and knowledge when it is seeking to prevent discharge of the note under the Bankruptcy Code. Thus, as the Supreme Court stated in *Langley,* when a situation involves collusion between a bank officer and a borrower, the key point in time is when the collusive agreement was struck. In this case the FDIC had no

knowledge of the debtor's attempts to revoke the forged note at the time when the collusive agreement was struck. Such an argument borders on the ridiculous. Any knowledge which the FDIC might have acquired through a subsequent examination affords the debtor no protection in this instance.

Accordingly, the Court agrees with the bankruptcy court that all the elements under § 523(a)(6) were established.

## CONCLUSION

The bankruptcy court is AFFIRMED in its holdings as to Count I and Count II. The Clerk is directed to enter final judgment.