In re Danny L. STEFANOFF, Debtor.

**FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION, as Receiver for Victor Savings and Loan Association, Plaintiff,**

v.

**Danny L. STEFANOFF, Defendant.**

**Bankruptcy No. 88–00700–C.
Adv. No. 88–0193–C.**

United States Bankruptcy Court,
N.D. Oklahoma.

Oct. 3, 1989.

George deVerges, Tulsa, Okl., for plaintiff.

Steven M. Harris, Tulsa, Okl., for defendant.

## MEMORANDUM OF INTERLOCUTORY OPINION AND ORDER

STEPHEN J. COVEY, Bankruptcy Judge.

On July 31, 1989, the Court heard this adversary proceeding brought under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6) to determine the dischargeability of certain debts owed by the Defendant, Danny L. Stefanoff ("Stefanoff"), to Plaintiff, Federal Savings and Loan Insurance Corporation ("FSLIC"), as receiver for Victor Savings and Loan Association ("Victor Savings").

Plaintiff's complaint raised objections to the discharge of debts arising out of three transactions—the Burgundy Place, Town & Country Bank, and Sallisaw RV Park transactions, respectively. Prior to trial, the allegations with regard to the Burgundy Place transaction were dismissed. At trial, for the reasons stated on the record, the Court granted Defendant's motion for directed verdict as to the dischargeability of the debt arising out of the Town & Country transaction. Also at trial, for the reasons stated on the record, the Court ruled that Plaintiff had failed to establish a prima facie case under 11 U.S.C. § 523(a)(6) regarding the dischargeability of the debt arising out of the Sallisaw RV Park transaction. The Court took under advisement the issue of Plaintiff's objection under 11 U.S.C. § 523(a)(2)(A) regarding the dischargeability of the debt arising out of the Sallisaw RV Park transaction. With regard to this count, after considering the evidence and the arguments and authorities presented by counsel, the Court finds as follows:

## FACTS

In the spring of 1986, Stefanoff and Bill Walsh ("Walsh") agreed to form a partnership known as the Sallisaw R.V. Limited Partnership for the purpose of (1) purchasing real estate in the area of Sallisaw, Oklahoma, in the vicinity of the Blue Ribbon Downs Racetrack, and (2) constructing on such real estate a recreational vehicle park ("Sallisaw RV Park"), including pads, clubhouse, swimming pool and other amenities. Walsh and Stefanoff intended to finance the acquisition and development of Sallisaw RV Park through a loan from Victor Savings. At this time, Walsh had just resigned as an officer and member of the Board of Directors of Victor Savings. Stefanoff was an advisory member of Victor Savings' Board, was a member of Victor Savings' Executive Committee and had previously borrowed from Victor Savings between $12 and $14 million for other projects in which he was involved. Victor Savings' Executive Committee was responsible for approving approximately 75% of the loans made during this period and was primarily involved in disposing of real estate projects which Victor Savings had foreclosed upon or otherwise repossessed ("REO's").

Walsh originated the idea and developed the plan and budget related to the construction of Sallisaw RV Park. Stefanoff's role was to aid in securing the financing for the project through Victor Savings. Also, one of Stefanoff's businesses was to be employed as the contractor to construct the improvements at Sallisaw RV Park.

Stefanoff informed Walsh that he could arrange $2.5 million in financing from Victor Savings for the Sallisaw RV Park project. Based on Walsh's cost projections and income pro formas, $1.4 would be loaned for construction and the remaining $1.1 million would be used to purchase the real estate. Both Stefanoff and Walsh anticipated that they could purchase the real estate for much less than $1.1 million, but they planned to arrange a straw man or turnaround sale to make it appear that the purchase price was approximately $1.1 million. Stefanoff and Walsh agreed that they would split the excess loan proceeds not necessary to purchase the real estate.

Stefanoff also informed Walsh that, as a condition to obtaining the Sallisaw RV Park financing, Walsh individually would have to assume the ownership and liability for a Victor Savings' REO in Commerce, Texas, consisting of an apartment complex, and also pay approximately $300,000.00 in interest on other defaulted loans. Walsh agreed to this condition believing that he could use his share of the excess loan proceeds on the Sallisaw RV Park project to fulfill these obligations until he was able to make the REO's profitable.

With this plan in mind, in early June of 1986, Walsh contacted William Boyd ("Boyd"), who was doing business as Executive Realty, and hired him to locate and purchase as a straw man 90 to 100 acres of suitable real estate for the Sallisaw RV Park. Walsh agreed to pay Boyd a fee of $100,000.00. Boyd in turn contacted J.J. Hight ("Hight"), who was doing business as Valley Land Title Company, and hired

him to locate the property and agreed to pay him $25,000.00. Hight located suitable real estate consisting of two tracts of land, one owned by the Pennys and one by the Bagleys. On June 23, 1986, Boyd entered into contracts to purchase the real estate with the Pennys and Bagleys for a total price of $270,000.00.

Prior to or during June of 1986, Stefanoff arranged for approval of the Sallisaw RV Park loan. In June, when Walsh first met with one of Victor Savings' loan officers, Jim Eaton, the loan had already been informally approved although no loan application had been made and Victor Savings had no written information concerning the project. At this meeting, Walsh delivered to Jim Eaton his cost projections and income pro formas, a copy of the uncompleted Sallisaw R.V. Park certificate of limited partnership (Exhibit 7), and a copy of a real estate sales contract between Boyd and Sallisaw R.V. Limited Partnership (Exhibit 18). The real estate sales contract indicates that the purchase price of the Sallisaw RV Park property is $1.116 million. Following this meeting, on June 30, 1986, Walsh received a letter from Victor Savings signed by Don Vale, Senior Vice President, confirming approval of the $2.5 million loan. Prior to finally approving the loan, Victor Saving hired Mr. Stansifer, an M.A.I. certified appraiser, to value the Sallisaw RV Park property. At the time the loan was finally approved, the written appraisal report had not been completed, but Victor Savings was aware of Mr. Stansifer's valuation. As reflected in the written appraisal report dated July 15, 1986, Mr. Stansifer valued the real estate at $1.1 million and the proposed improvements at $2.224 million, a total value of $3.324 million for the completed project.

On July 17, 1986, the Sallisaw R.V. Limited Partnership filed its certificate of limited partnership (Exhibit 7) with the Oklahoma Secretary of State. Walsh was listed as general partner and a limited partner and Stefanoff was listed as a limited partner of the partnership.

On July 23, 1986, the $2.5 million loan from Victor Savings to Sallisaw R.V. Limited Partnership was closed in Hight's offices in Sallisaw, Oklahoma. Walsh, as general partner, executed a Construction Loan Agreement (Exhibit 26), Construction Mortgage and Security Agreement (Exhibit 24), and Promissory Note in the amount of $2.5 million (Exhibit 22). Prior to the closing, Walsh obtained a check in the amount of $1.116 million (Exhibit 8) from Victor Savings payable to Victor Savings and endorsed to Valley Land Title Company, Hight's business, which was acting as closing agent for the purchase of the Sallisaw RV Park property. In connection with the loan closing, Victor Savings either prepared a settlement statement or obtained a settlement statement prepared by Walsh on HUD Standard Form 1A (Exhibit 16) which indicated that $1.116 million of the $2.5 million loan was made to pay the Pennys and Bagleys a contract sales price of $1.116 million to purchase the Sallisaw RV Park property.

Also on July 23, 1986, the purchase of the Sallisaw RV Park property by Boyd from the Pennys and Bagleys and then the purchase by Sallisaw R.V. Park Limited Partnership from Boyd were closed simultaneously in Hight's offices in Sallisaw, Oklahoma. The Pennys, the Bagleys, Boyd, Hight, and Walsh all attended the closing and the following events occurred:

(1) the Pennys received $120,000.00, less closing costs, and tendered a warranty deed for their 80.16 acres to Boyd. See Exhibit 2 and 3;

(2) the Bagleys received $150,000.00, less closing costs, and tendered a warranty deed for their 13.29 acres to Boyd. See Exhibit 1 and 3;

(3) Hight received a consulting fee of $23,500.00 and Willie B. Hale/Pat Coleman received a consulting fee of $10,000.00. See Exhibit 3;

(4) Boyd, through Executive Realty, received $812,005.02 (Exhibit 19 and 20), and Boyd tendered a warranty deed for the Sallisaw RV Park property to the Sallisaw R.V. Park Limited Partnership (Exhibit 9);

(5) Boyd, Walsh, the Pennys and Bagleys signed the settlement statement on HUD Standard Form 1A (Exhibit 16) which indi-

cates that $1.116 million of the $2.5 million loan from Victor Savings was used to pay to the Pennys and Bagleys for the purchase of the Sallisaw RV Park property.

Shortly after the closing, Boyd disbursed the $812,005.02 as follows: Executive Realty retained its agreed fee of $100,000.00; $8,752.00 was paid to Walsh as reimbursement for expenses incurred in the real estate transaction; and, of the remaining $703,253.02, Walsh received $351,626.51 and Stefanoff received $351,626.51. See Exhibit 20. Also sometime following the closing, the HUD Standard Form 1A settlement statement (Exhibit 16) was given or returned to Victor Savings, but the other settlement statements prepared at the closing (Exhibits 1-4) were retained by Hight. Finally, Victor Savings had Walsh complete a loan application (Exhibit 17) following the actual closing of the loan.

In the Fall of 1987, the Federal Home Loan Bank Board appointed FSLIC as receiver for Victor Savings, at that time known as Victor Federal Savings and Loan Association. At that time, the only documents relating to the Sallisaw RV Park loan transaction in the loan files were the Promissory Note (Exhibit 22), Construction Mortgage and Security Agreement (Exhibit 24), Construction Loan Agreement (Exhibit 26), the appraisal of Mr. Stansifer (Exhibit 29) and the HUD Standard Form A1 settlement statement (Exhibit 16) showing the sale of the property from the Pennys and Bagleys to Sallisaw R.V. Limited Partnership for $1.116 million. The other settlement statements (Exhibits 1-4), the original loan application (Exhibit 17), and the real estate contract between Boyd and Sallisaw R.V. Limited Partnership were not in the loan file when FSLIC originally took over Victor Savings, but were later recovered after FSLIC investigated the loan transaction.

On July 29, 1988, the Federal Home Loan Bank Board again appointed FSLIC as receiver for Victor Savings. FSLIC foreclos-ed upon the Sallisaw RV Park and has been unable to sell the project to a third party.

On the 18th day of March 1988, an Involuntary Petition was filed against Stefanoff and on the 18th day of April 1988, an Order for Relief under Chapter 7 was entered. On the 22nd day of July, 1988, the FSLIC filed this Complaint asking the Court to determine the dischargeability of its debt.

## LEGAL ANALYSIS

In order to prevail under 11 U.S.C. § 523(a)(2)(A), FSLIC must prove by clear and convincing evidence the following elements:

(1) Stefanoff made a materially false representation (other than a statement respecting Stefanoff's or an insider's financial condition);

(2) Such false representation was made with the requisite moral turpitude or intentional wrong;

(3) FSLIC or Victor Savings reasonably relied on such false pretenses, false representation, or intentional wrong;

(4) Money, property, services, or an extension, renewal, or refinancing of credit was obtained; and

(5) Stefanoff owes FSLIC a debt for such money, property, services, or extension, renewal, or refinancing of credit.

See *In re Black*, 787 F.2d 503 (10th Cir. 1986) and *In re Mullet*, 817 F.2d 677 (10th Cir.1987).

▮ The Court finds that Stefanoff, through his partner Walsh, made a materially false representation that the purchase price of the Sallisaw RV Park property was $1.116 million. The conduct of Walsh may be imputed to Stefanoff since Stefanoff not only knew of the false representation but also authorized it and condoned it. *In re Paolino*, 75 B.R. 641 (Bankr.E.D.Pa.1987); *In re Cecchini*, 780 F.2d 1440 (9th Cir. 1986).[1]

---

1. Walsh testified that Stefanoff originated the idea of the straw man or turnaround sale to disguise the purchase price of the Sallisaw RV Park property. Stefanoff denied any knowledge of the false sales price. On the whole, the Court finds Walsh's testimony is credible and consistent in light of the testimony of other witnesses.

■ The Court further finds that the false representation was made with the requisite moral turpitude or wrongful intent. Walsh and Stefanoff engaged in the straw man or turnaround sale deliberately to deceive Victor Savings and Victor Savings' examiners and regulators by making it appear that the purchase price of the Sallisaw RV Park property was $1.116 million rather than $270,000.00.

The Court further finds that $1.116 million was in fact obtained from Victor Savings in connection with the Sallisaw RV Park real estate purchase with the remainder of the $2.5 million loan to be used for construction of the improvements thereon. Prior to making the loan, Victor Savings knew that the purpose of the loan was to buy real estate in Sallisaw. Through the real estate contract between Boyd and Sallisaw R.V. Limited Partnership (Exhibit 18), Victor Savings believed the cost of the real estate would be $1.116 million. Also, the HUD Standard Form 1A settlement statement (Exhibit 16) indicates that Victor Savings loaned $1.116 million so that Sallisaw R.V. Limited Partnership could purchase the Sallisaw RV Park real estate for this amount.

■ Additionally, Stefanoff owes a debt for this money obtained. Although Stefanoff was in name a limited partner and therefore not liable on the promissory note, the evidence indicated that, with regard to decisions concerning the financing for Sallisaw RV Park, Stefanoff took part in the control of the business of the limited partnership to such an extent as to make him liable as a general partner in this regard. 54 O.S. § 148. Alternatively, the Court holds that even a limited partner who actively participates in perpetrating a fraud, false pretenses, or the making of a false representation under 11 U.S.C. § 523(a)(2)(A) becomes personally indebted for the money obtained by the partnership thereby. *Levy v. Runnells*, 66 B.R. 949, 960 (Bankr.E.D.Va.1986).

Thus it is clear that Plaintiff has established elements 1, 2, 4, and 5 discussed above and the Court arrives at the issue most vigorously disputed by the parties—whether Victor Savings relied on the false representation. The Court first finds that the evidence is not clear and convincing to show that Victor Savings actually relied on the false representation in making the loan. First, Stefanoff, as a member of the Executive Committee, arranged for approval of the loan and Stefanoff himself was aware that the representation as to the purchase price of the property was false. Therefore, Victor Savings cannot be said to have relied on the false representation. Furthermore, to the extent that other officers may have been involved in the loan approval or review process, it is not clear what, if anything, they relied on. It appears that Victor Savings made the loan because the Sallisaw RV Park property appeared to provide adequate collateral, Walsh and Stefanoff were well known and trusted individuals, and Victor Savings, by making the loan, was able to dispose of one of its REO's in Commerce, Texas, thereby improving its own poor financial position.

■ However, FSLIC need not prove actual reliance by Victor Savings to establish its case under 11 U.S.C. § 523(a)(2)(A). Rather, FSLIC is deemed as a matter of law to have relied solely on the written records of Victor Savings as they existed at the time FSLIC was appointed receiver for the institution. *D'Oench, Duhme & Co., Inc. v. Federal Deposit Insurance Corporation*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)—originating the doctrine that the FDIC is not bound by secret agreements concerning the repayment of loans; *Langley v. Federal Deposit Insurance Corporation*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)—expanding the *D'Oench* doctrine to situations where bank made misrepresentations inducing a borrower to enter into loan; *In re Cerar*, 97 B.R. 447 (C.D.Ill.1989)—applying the *D'Oench* doctrine in the context of the reliance requirement under 11 U.S.C. § 523(a)(2)(A); *Federal Deposit Insurance Corporation v. Galloway*, 856 F.2d 112 (10th Cir.1988)—applying the *D'Oench* doctrine in cases of fraudulent inducement; and *Mainland Sav. Ass'n v. Riverfront Associates, Ltd.*, 872 F.2d 955 (10th Cir.

1989)—applying the *D'Oench* doctrine to cases involving the FSLIC.

■ The Court finds the evidence is clear and convincing that, at the time FSLIC was originally appointed receiver for Victor Savings, the loan files of Victor Savings indicated that the purchase price of the Sallisaw RV Park property was $1.116 million and nothing in such loan files showed that the purchase price had been artificially inflated by a straw man or turnaround sale. Thus, under the authorities cited above and particularly *Cerar*, FSLIC is deemed to have relied on the truth of the representation in the loan files as to the purchase price of the Sallisaw RV Park property and, thus, has met its burden of proof on the issue of reliance.

Another way of analyzing the *D'Oench* doctrine as applied in proceedings under 11 U.S.C. § 523(a)(2)(A) is to begin with the loan files themselves. Any representations contained in the loan files are deemed made to the FSLIC once the FSLIC is appointed receiver for the financial institution. If there is a materially false representation in the loan files, FSLIC has a potential action under 11 U.S.C. § 523(a)(2)(A). As a matter of law, FSLIC is entitled to rely on the truth of the representations made in the loan files and is not bound by agreements, misrepresentations or fraud not apparent from the loan files themselves.

The Court concludes that FSLIC has established its case under 11 U.S.C. § 523(a)(2)(A). The evidence is both clear and convincing. In addition to the credibility of Walsh's testimony, as corroborated by other witnesses, the Court finds particularly compelling the undisputed fact that Stefanoff received $351,626.51, half of the excess loan proceeds obtained as a result of the straw man scheme. It is inconceivable to the Court that an innocent investor would share so generously in the fruits of the sham. Rather, the strong inference from this fact is that Stefanoff played a key and valuable role in perpetrating the deception.

At trial, the Court reserved for later hearing a determination of the exact amount of FSLIC's claim arising out of the Sallisaw RV Park debt. Accordingly, on the 26th day of October, 1989, at 9:30 a.m. the Court shall conduct a hearing to determine this amount.