In re Aristide Francis LEFEVE, Jr., Debtor.

**FEDERAL DEPOSIT INSURANCE COR-PORATION, Successor in Interest and Receiver for Crescent Federal Savings Bank, Plaintiff,**

v.

**Aristide F. LEFEVE, Jr., Defendant.**

**Bankruptcy No. 8807506 SEG.**
**Adv. No. 880975SC.**

United States Bankruptcy Court, S.D. Mississippi.

May 28, 1991.

E. Howell Crosby, New Orleans, La., Hollis C. Thompson, Jr., Gulfport, Miss., for plaintiff.

R. Wayne Woodall, Gulfport, Miss., for defendant, debtor.

OPINION

EDWARD R. GAINES, Bankruptcy Judge.

A complaint objecting to the dischargeability of a debt was filed by The Federal Savings and Loan Insurance Corporation as Receiver for Crescent Federal Savings Bank, and later substituted by The Federal Deposit Insurance Corporation, pursuant to section 523 of Title 11 of the United States Code. The matter was set for trial and heard by the Court.[1] Having considered

---

1. The complaint was set for trial and heard simultaneously with the complaint to determine

the pleadings, briefs submitted by counsel and the evidence presented at trial, the Court finds that the debt which is the subject of this proceeding should not be discharged by the debtor, Aristide Francis Lefeve, Jr.

The Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334, § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (I) and (O).

## I. FACTS

The Court makes the following findings regarding the loan from Crescent Federal to the debtor, Aristide F. Lefeve, Jr.

1. A petition for relief under Chapter 7 of Title 11 of the United States Code was filed by the debtor on March 9, 1988.

2. An adversary complaint was filed by the Federal Savings and Loan Insurance Corporation, as Receiver for Crescent Federal Savings Bank wherein the Court was requested to determine a certain indebtedness of Lefeve to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).[2]

3. On December 3, 1984, Lefeve submitted a written loan application requesting a loan from Crescent to finance the purchase of two parcels of vacant land in the northeast corner of Iberville Drive and U.S. Highway 90 in Biloxi, Mississippi.

4. In connection with his loan application, Lefeve submitted or caused to be submitted on his behalf a financial statement to Crescent.

5. Lefeve represented that the financial statement was a true and accurate description of his financial condition.

6. Lefeve executed the financial statement, that was dated July 5, 1984, on October 11, 1984, and attached it by specific reference to his loan application to Crescent.

7. Lefeve entered a written termination agreement dated August 28, 1984 with Longboat Development Corporation, The Sutton Road Company, Inc., L.J. Munna, III, and Harry C. Sherman, that terminated Lefeve's ownership interests in several parcels of real estate. A letter dated April 13, 1984, outlined the division of interests that resulted in the termination agreement.

8. A check payable to Lefeve in the amount of $12,500.00 was issued on August 28, 1984, as the cash consideration pursuant to the termination agreement.

9. At the time the financial statement was signed and delivered to Crescent, Lefeve no longer had any interest in certain properties listed as current assets in the statement including: (1) a 5.86 acre condominium site in Biloxi, Mississippi with a value of $1,275,000.00, (2) a one-third interest in property at Natchez Alley in New Orleans with a value of $173,500.00, and (3) a house on Lot 15, Rivers Bend Subdivision, valued at $94,072.00.

10. Liabilities were owed by Lefeve that were not reflected on the financial statement including: (1) a mortgage on property on Interstate 10 in excess of $150,000.00, (2) a guaranty in favor of Northlake Federal Savings & Loan Association for a loan totalling $1,150,000 in connection with Brodie Island, (3) a continuing guaranty in favor of Audubon Federal Savings & Loan Association for a loan in the amount of $3,800,000.00, and (4) a guaranty in favor of Northlake Federal Savings & Loan for a loan of $75,000 to Leonard J. Munna, III and David Pyburn.

11. The financial statement showed Lefeve as the individual owner of properties which were actually owned by other legal

dischargeability filed by the FDIC as Receiver for New Orleans Federal Savings and Loan Association in Adversary No. 880974 SC. The New Orleans Federal complaint alleged violations under 11 U.S.C. § 523(a)(2)(B) involving the same financial statement that is the subject of this proceeding. Portions of this opinion are taken from briefs filed by the parties in these cases.

**2.** After commencement of this proceeding the Federal Deposit Insurance Corporation substituted itself as the Receiver for Crescent Federal pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L.No. 101–73, § 401(f)(2), 103 Stat. 183, 356 (1989). Accordingly, the Plaintiff in this proceeding will be referred to hereinafter as the Federal Deposit Insurance Corporation (FDIC).

entities, such as corporations and partnerships, in which he only held an interest.

12. Crescent's bank files reflect that Lloyd Giblin, then President of Crescent, received correspondence dated November 1, 1984, from J. Van Provosty, as agent for Lefeve, introducing the proposed loan package to Crescent.

13. On December 3, 1984, Lefeve hand delivered a loan package to Paul A. Gauthreaux, Jr., an officer at Crescent, containing: (1) a cover letter from Lefeve, (2) the loan application, (3) the financial statement, (4) a verification of his bank deposits, (5) a photocopy of Lefeve's latest credit report, and (6) his tax returns for the years 1981, 1982 and 1983.

14. Although a credit report was included in the loan package, Crescent obtained an updated credit report from a credit bureau.

15. The loan proposal prepared by Crescent indicated that security for the proposed loan would be a first mortgage on the real property to be acquired and the personal guaranty of Lefeve. The proposal listed Lefeve's net worth as $1,976,430.00.

16. Minutes from a December 4, 1984 Crescent loan committee meeting reflect that the loan proposal was approved.

17. The real estate loans documentation check list maintained in Crescent's bank file notes that the file contained Lefeve's financial statement and income tax returns as well as a credit report and verification of deposits listed on his financial statement.

18. On or about December 19, 1984, Crescent loaned to Lefeve $317,000.00. Lefeve signed a Deed of Trust Note payable to Crescent and a collateral deed of trust dated December 19, 1984, encumbering the real property located in Biloxi, Mississippi.

19. On September 8, 1986, the property was foreclosed upon in accordance with the terms of the Deed of Trust.

20. On January 9, 1987, the FSLIC filed suit to collect the deficiency due and judgment was entered on February 1, 1988 in the amount of $232,157.81 in favor of FSLIC against the debtor in this proceeding, Aristide Lefeve.

## II. ISSUES

The issue for decision before the Court is whether Lefeve's debt to Crescent is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) by Lefeve's submission to Crescent of a materially false financial statement respecting his financial condition.

## III. LAW

■ Section 523(a)(2)(B) of Title 11 of the United States Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of creditor, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive ...

11 U.S.C. § 523(a)(2)(B). The burden of proof for establishing an exception to discharge under section 523(a) is now by a preponderance of the evidence and not by the stricter standard of clear and convincing evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ The financial statement here showed numerous assets that Lefeve either never owned in his individual name, or had any interest in at the time of submission of the statement. The financial statement failed to disclose substantial contingent liabilities although the statement was very detailed, and contained supplementary explanatory notes. Ashton Ryan, a CPA at Arthur Anderson & Company responsible for rendering opinions on financial statements, testified that the level of detail in Lefeve's financial statement was exemplary. The debtor argues that a general com-

ment preceding the statement to the effect that the debtor may have contingent liabilities in the event of default of a partner was sufficient to put the reader on notice that he should ask questions. The differences between Lefeve's actual financial condition and that shown on his financial statement were material and should have been disclosed without interrogation or investigation by Crescent. *See, Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1016 (5th Cir.1990) (spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for unrecorded liabilities). It is noted by the Court that it took several days of testimony for Lefeve himself to try to explain discrepancies in his own financial statement.

Lefeve attempted to persuade the Court that after all corrections were made in his financial statement to reflect correctly the actual assets and liabilities as of the date the financial statement was submitted, that the misrepresentations in his overall net worth were not material and that his financial condition was actually better than that shown. The Court holds that the evidence of material discrepancies in Lefeve's financial statement by overvaluing assets and undervaluing liabilities is overwhelming, particularly when the extensive detail and supplemental explanatory notes included as a part of the "exemplary" statement is considered. Additionally, the evidence submitted by Lefeve in attempting to show that his assets were greater than that shown was not sufficiently substantiated or persuasive. Where a financial statement contains numerous material misrepresentations of the kind depicted in Lefeve's financial statement, the debtor should not be allowed to claim a counterbalancing effect by showing yet additional discrepancies that appear to favor the debtor's overall financial condition. In *In re Jordan*, 927 F.2d 221 (5th Cir.1991), the debtors attempted to use this rationale:

> The Jordans begin by denying that they provided Southeast with data that were materially false. They admit that their balance sheets and supplementary statements omitted several of their own

and their corporation's liabilities, but assert that certain assets used to secure these liabilities were also excluded from these documents. As they see it, the unmentioned assets were approximately equivalent in value to unmentioned liabilities. Thus, they conclude, the omissions did not render their data materially untrue, because the data gave an essentially accurate portrayal of their aggregate net worth....

> A materially false statement is one that "paints a substantially untruthful picture of a financial condition by representing information of the type which would normally affect the decision to grant credit." ... Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." (citation omitted). Finally, it is well-established that writings with pertinent omissions may qualify as "materially false" for purposes of § 523(a)(2)(B). (citation omitted)

> With these principles as a backdrop, we reject the Jordans' argument for two independent reasons. First, the couple has failed to substantiate their assertion that the omitted liabilities were accompanied by omitted assets.... Second, even if the Jordans' assertions were borne out by the record, the data they submitted to Southeast were materially false for reasons wholly apart from omitted liabilities. Stated another way, the missing liabilities on the Jordans' balance sheets and supplementary statements were but the tip of the proverbial iceberg.... We thus agree with the bankruptcy court that the Jordans provided Southeast with written financial documents that were "materially false."

927 F.2d at 224.

Additionally, the debtor raises the argument that the termination agreement that divested him of properties in August of 1984 was not recorded at the time of submission of the financial statement and thus the property was still technically his and disclosure was not necessary. He further

stated that he only updated his financial statement every six months. In *In re Duncan*, 81 B.R. 665 (Bankr.M.D.Fla.1987) the Court stated that:

Demonstrating the debtors submitted the application and financial statement with the intent to deceive does not require a showing of actual knowledge of the falsity of the two documents. (citations omitted).

A creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of the accuracy of the information in the financial statement of the debtor. (citations omitted). While it is apparent the debtors and [third party purchaser] believed the debtors retained some sort of ownership interest in the real property, it is just as apparent the debtors recklessly disregarded the fact some interest may have been conveyed to [third party purchaser] by quit claim deed. The debtors knew that by failing to mention the transfer by quit claim deed, the financial statement and application were inaccurate. Thus, this element of Section 523(a)(2)(B) is met by clear and convincing evidence. In passing, the court would note there is sufficient evidence to establish this burden on the "Half Truth" doctrine. (citations omitted).

81 B.R. at 668. Additionally, the Court in *Brigadier Homes v. Hert*, 81 B.R. 638 (Bankr.N.D.Fla.1987) stated the following:

The element of intent must finally be addressed. Intent may be inferred from the surrounding circumstances. (citation omitted). Reckless disregard for the truth or falsity of a statement combined with the shear magnitude of the resultant misrepresentation may combine to produce the inference of intent. (citations omitted). This court finds Hert's nondisclosure of his limited ownership interest in the California property and his failure to amend the property value listed for the Indiana property upon learning of its over-inflated worth to be, at the least, reckless statements constituting willful misrepresentations. Hert made these willful misrepresentations which he should have known would in-

duce these parties to enter into the financial and contractual relationship with him, thus his intent to deceive the plaintiffs may be inferred. *Carini v. Matera*, 592 F.2d 378 (7th Cir.1979).

81 B.R. at 641.

Additionally, in *In re Barrett*, 2 B.R. 296, 301 (Bankr.E.D.Pa.1980), the Court stated that it will not shield an intelligent, educated businessman, who had ample opportunity to read what he signed, from his own carelessness, especially in light of his extensive dealings with banks. Lefeve is an experienced attorney, a real estate speculator and is sophisticated in real estate financing and underwriting criteria. His testimony reflects a very high degree of business acumen and familiarity with loan transactions and lending practices. In *In re Jordan, supra,* the Fifth Circuit stated that:

Nevertheless, [*In re Icsman* [64 B.R. 58 (Bankr.N.D.Ohio 1986)] is not so far afield as to discredit its message: that debtors with business acumen, like the Jordans, are to be held to a higher standard. *See also In re Mutschler,* 45 B.R. 482 (Bankr.D.N.D.1984) ("Where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold them responsible for uttering a false financial statement") ... [O]ur review of the record convinces us that the bankruptcy judge was well within his discretion in inferring an intent to deceive from the circumstances surrounding the preparation and submission of the Jordans' financial statements.

927 F.2d at 226. The Court finds, given the size of the discrepancies and misrepresentation in light of the experience and intelligence of the debtor, that the element of intent has been established by the evidence presented.

 Ashton Ryan testified that an underwriter relies heavily on a financial statement and especially one that was as well prepared as Lefeve's. As stated earlier, he testified that the level of detail in Lefeve's financial statement was exemplary. He testified that a financial statement that

was not current and that did not reflect material changes would not be meaningful to a lender or underwriter. Ryan concluded that the financial statement was relied upon. Lefeve takes the position that the bank based its loan on appraisal values and that it did not in any way rely on any financial statements or loan applications that were requested or submitted. The Court finds that the element of reliance was established by the evidence presented in this case. Additionally, the Court holds that even in the absence of this proof, reliance may be presumed as a matter of law given the posture of the FDIC as a party and the application of the *D'Oench, Duhme* doctrine, as discussed below.

Under the case of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny, the receiver of a federally insured bank or savings and loan association is protected from defenses based on side agreements or understandings not in the official papers of the failed institution. *D'Oench* has been applied to foreclose factual disputes concerning reliance under § 523(a)(2).[3] In *In re Cerar,* 97 B.R. 447 (C.D.Ill.1989), the District Court stated:

> Normally, the existence of the element of reliance which must be established in order to prevent discharge of a debt depends upon whether the creditor actually relied on the debtor's representation when loaning money or providing services. However, the situation is different where the debtor's fraud was performed in conjunction with his creditor for the purpose of deceiving banking examiners and ultimately the FDIC.

97 B.R. at 449. See also, *In re Figge,* 94 B.R. 654, 665 (Bankr.C.D.Cal.1988). Further, in *In re Bombard,* 59 B.R. 952 (Bankr.D.Mass.1986) the Court held that reliance required by § 523(a)(2)(A) was furnished by the federal statute and the federal common laws which entitled the FDIC to rely on the bank records. The Court spe-

cifically found that proof of the bank's reliance itself was unpersuasive, but stated that the deficiency in proof was of little consequence because the FDIC was entitled to rely on the debtor's signature as a matter of law. 59 B.R. at 954.

■ Courts generally agree that the creditor must show that it considered and relied on the actual financial statement in question. *In re Dawson,* 16 B.R. 70, 73–74 (Bankr.E.D.Va.1981). However, it is true that "lenders do not have to hire detectives before relying on borrower's financial statements." *In re Figge,* 94 B.R. 654, 666 (Bankr.C.D.Cal.1988). *See also, In re Garman,* 643 F.2d 1252, 1260 (7th Cir.1980).

In *In re Figge,* supra, the Court held that the doctrine of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), "creates a presumption of reasonable reliance" by the FDIC in its objection to discharge of a debtor based on § 523(a)(2)(A) and (B). The Court stated that, "the element of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement". 94 B.R. at 668. In *Figge,* the Court found that the documents contained in the loan file satisfied the element of reasonable reliance. They included: (1) the debtor's financial statement submitted in support of his application for the loan, (2) the promissory note, (3) notes by the bank's personnel reflecting a credit check, (4) the security agreement, and (5) evidence of payment history.

The documentation in the loan file of Crescent includes: (1) a cover letter from Lefeve; (2) the loan application; (3) the financial statement; (4) a verification of his bank deposits; (5) a photocopy of Lefeve's latest credit report and (6) his tax returns for the years 1981, 1982 and 1983.

The Fifth Circuit recently expounded on the extensive application of the *D'Oench,*

---

**3.** The element of reasonable reliance is the same under sections 523(a)(2)(A) and (B). *In re Turner,* 1989 WL 105750 (Bankr.N.D.Ill.1989). *In re Howarter,* 95 B.R. 180 (Bankr.S.C.Cal.

1989), *aff'd,* 114 B.R. 682 (9th Cir. BAP 1990). Therefore, the cases dealing with either section are authoritative on the element of reliance here.

*Duhme* doctrine in *Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013 (5th Cir. 1990) [4] as follows:

> The original *D'Oench* case applied only to a secret agreement used as a defense to a suit on a note by FDIC in its corporate capacity ... [T]he doctrine has evolved to a rule that today is expansive and perhaps startling in its severity. The doctrinal extension we describe is considerable, but we believe experience has been a wise teacher.
>
> The modern *D'Oench* rule protects the FDIC, as receiver of a failed bank or as purchaser of its assets, from a borrower who has "'lent himself to a scheme or arrangement' whereby banking authorities are likely to be misled." *Beighley v. Federal Deposit Ins. Corp.*, 868 F.2d 776, 784 (5th Cir.1989) (quoting *D'Oench*). In particular, *D'Oench* bars the use of unrecorded agreements between the borrower and the bank as the basis for defenses or claims against the FDIC ... Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either ...

915 F.2d at 1015–16.

The evidence in this matter is abundantly clear that Lefeve, at a minimum, "lent himself to a scheme or arrangement whereby banking authorities are likely to be misled". His own testimony indicates an intimate knowledge of loose banking practices among financial institutions with which he dealt during the period of time involving the transactions at issue. Even with this knowledge Lefeve chose to participate in the practices for his own pecuniary gain. Given his experience as a real estate developer and attorney with extensive knowledge in lending policies and practices, it can be unquestioned that Lefeve knew the reasoning behind banking regulations of federally insured institutions which required accurate financial statements and other documentation to be included in a borrower's loan file. Thus, even if Lefeve could prove that the actual lending officials with which

he conducted his business did not rely on any financial statements he submitted before granting him a loan, he would not be able to show that bank regulators, auditors, or receivers, up the line, should not be entitled to rely on the truth on those documents. The facts of this case provide the very type of scenario which is intended to be covered by the doctrine of *D'Oench, Duhme* in the protection of the FDIC as an insurer. On this basis, the Court concludes that documentation in Lefeve's loan file satisfies the element of reliance by application of the doctrines announced in *D'Oench, Duhme*, and *Figge* as cited above.

The Court notes, additionally, that malfeasance has been specifically rejected by the Fifth Circuit as a requirement for application of *D'Oench, Duhme*, thus determining the borrower's good faith irrelevant. In *Bowen v. Federal Deposit Ins. Corp.*, the Court stated:

> In an attempt to escape the dungeon of Duhme, the Bowens raise a number of claims. Principally, they argue that *D'Oench, Duhme* requires "malfeasance" on the part of the borrower ... [O]ur more recent holdings explicitly disavow a requirement of malfeasance:
>
> > We can dispense easily with [the] contention that the *D'Oench, Duhme* rule bars only claims or defenses based upon illegal side agreements entered into for the purpose of deceiving banking authorities.... [T]he Court [in *D'Oench, Duhme*] suggested that [the rule applies] even [to] a borrower who ... did not "intend[ ] to deceive any person".... Hence, it is irrelevant ... whether [the borrower] acted in good faith ...
>
> The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments? Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the

---

**4.** Although not a decision dealing with dischargeability in bankruptcy, this opinion is instructive on policy and application of the *D'Oench, Duhme* doctrine.

government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities. Perhaps mindful of the fate that befell the Baker, whose search for the Snark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away." (footnote omitted)

The dangers of a contrary policy should be obvious. Today, stable financial institutions sometimes seem as elusive as the Snark. Unrecorded agreements—those rooted in the loose soil of casual transactions as much as those that spring from the malodorous loam of outright fraud—are a threat to the ecology of the banking system that we can ill-afford. To check the growth of these hardy perennials, *D'Oench* forces borrowers to bear the risk that their unorthodox plants will bear no fruit. Those who till these soils may not shift the cost of their peculiar agronomy to the FDIC, the bank's depositors and unsecured creditors, and the taxpayers and depositors who fund the FDIC. (citations omitted).

As to the Bowens' malfeasance requirement, we would decline to adopt it even in the absence of precedent. Adulterating *D'Oench, Duhme* would amount to abandoning a bedrock protection for the uncertainty of quick-clay, a seemingly stable substance notorious for its rapid liquefaction. The firm resolution we provide today would collapse into an uncertain and fact-bound inquiry, soon to be followed by a landslide of "good faith" claims against the FDIC. We are not willing to remake the topography of the banking system in such a fashion. Nor, apparently, is Congress, which has directed the courts to void unrecorded agreements against the interests of FDIC–Receiver without regard to malfeasance ... Accordingly, we reaffirm our earlier holdings: the *D'Oench, Duhme* doctrine is applicable even in the absence of malfeasance.

As an alternative to their malfeasance requirement, the Bowens suggest that *D'Oench* requires at least recklessness or negligence on the part of the borrower. They cite no authority for this proposition, however, and we do not regard it as consistent with our precedent or our holding today.

915 F.2d at 1016–17.

Based on the evidence presented, and on the law contained in this opinion, the Court finds that the burden of proving the elements necessary to establish an exception to discharge under section 523(a)(2)(B) have been satisfied by the FDIC. Additionally, the Court notes that the element of reliance, although proven here, is presumed under the application of *In re Figge* and *In re Cerar*, as previously cited.

In summary, the Court concludes that the debtor, Aristide Francis Lefeve, Jr., obtained his loan from Crescent Federal by the use of a materially false financial statement in violation of § 523(a)(2)(B), and the indebtedness to the FDIC in connection therewith is hereby determined to be nondischargeable.

This opinion shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

A separate judgment will be entered by the Court pursuant to Bankruptcy Rule 9021 and Federal Rule of Civil Procedure 58. Counsel for FDIC is requested to submit a form of judgment setting forth the correct computation of interest, fees and costs, within 21 days of the date of entry of this opinion.