In re James W. SMITH, II, Debtor.

FEDERAL DEPOSIT INSURANCE CORPORATION as Manager of the FSLIC Resolution Fund as Receiver for Vernon Savings and Loan Association, Plaintiff,

v.

James W. SMITH, II, Defendant.

In re Vernon B. SMITH, Jr., Debtor.

FEDERAL DEPOSIT INSURANCE CORPORATION as Manager of the FSLIC Resolution Fund as Receiver for Vernon Savings and Loan Association, Plaintiff,

v.

Vernon B. SMITH, Jr., Defendant.

Bankruptcy Nos. 387–35881–SAF–7, 387–36695–SAF–7.
Adv. Nos. 388–3278, 388–3390.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

April 13, 1990.

Brenda Collier, Arter and Hadden, Dallas, Tex., for FDIC.

Daniel J. Sheehan, Sheehan, Young, Smith and Culp, Dallas, Tex., for debtors.

MEMORANDUM OPINION
AND ORDER

STEVEN A. FELSENTHAL,
Bankruptcy Judge.

The Federal Deposit Insurance Corporation (FDIC)[1] as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, filed a complaint to determine the nondischarge-

1. *See* Footnote 2.

ability of debt in James Smith's bankruptcy on April 12, 1988, and in Vernon Smith's bankruptcy on June 2, 1988. The FDIC seeks to exclude from the Smiths' discharges outstanding balances for three loan transactions under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). This memorandum opinion contains the court's findings of facts and conclusions of law required by Bankruptcy Rule 7052. This court has jurisdiction over this core proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I).

The FDIC argues that the Smiths conspired with officers and the owner of Vernon Savings and Loan Association to deceive the lending institution examiners about the true nature and purpose of three loan transactions known as Cedar Springs, Celestial/Montfort and New York Avenue. The loans, according to the FDIC, represented an exchange of favors: the Smiths agreed to purchase Cedar Springs at an inflated price to permit Vernon Savings to avoid writing off Cedar Springs at a loss, and in return Vernon Savings agreed to fund two additional imprudent loans, Celestial/Montfort and New York Avenue, and agreed to permit the Smiths to use funds from those loans for general operating capital rather than solely for land acquisition and development of the subject properties. According to the FDIC, the Smiths concocted false statements of purpose for the loans and false statements of purpose for the draw requests made on the Celestial/Montfort and New York Avenue loans. The FDIC asserts that James Smith, using Conworth Properties, Inc., as a sham entity, misapplied for his personal use funds which should have been applied to develop the Celestial/Montfort and New York Avenue properties, and that the misapplication constitutes fraud as a matter of law, even if James Smith did not intend to deceive Vernon Savings or the lending institution examiners about the misapplied funds.

The Smiths deny any attempt to deceive the lending examiners through side agreements, saying that they fully intended to develop the properties. The Smiths claim that the Cedar Springs, Celestial/Montfort and New York Avenue loans constituted prudent transactions. James Smith asserts that he openly sought to use funds from Celestial/Montfort and New York Avenue for general operating capital, his draw requests document that use, and so he could not have intended to deceive the lending institution examiners.

The FDIC filed a motion for partial summary judgment on August 15, 1989. The court carried that motion to trial. This court's judgment following a trial on the merits of the FDIC's complaint moots the motion for summary judgment.

From 1985 through February, 1987, when the transactions that give rise to this adversary proceeding occurred, neither the FDIC nor the Federal Savings and Loan Insurance Corporation (FSLIC) controlled Vernon Savings and Loan Association. FSLIC did not obtain actual day-to-day control over the operations of Vernon Savings until November 19, 1987. The FDIC obtained control as manager of the FSLIC resolution fund, as receiver for Vernon Savings and Loan, FSA, by August 9, 1989. On August 16, 1984, FSLIC and Vernon Savings entered a supervisory agreement. It required voluntary compliance by Vernon Savings and could be disregarded. On June 19, 1986, FSLIC and Vernon Savings entered a cease and desist order. It too required voluntary compliance by Vernon Savings and could be disregarded. On March 20, 1987 the Federal Home Loan Bank Board (FHLBB) found Vernon Savings to be insolvent and appointed FSLIC as receiver. Vernon Savings became a federally chartered mutual savings and loan association, Vernon Savings and Loan Association, FSA, which operated from March 20, 1987, until November 19, 1987, when FHLBB declared Vernon Savings, FSA, to be insolvent and placed it in a liquidating receivership. FHLBB appointed FSLIC as receiver. On August 9, 1989, the FDIC became manager of the FSLIC resolution fund and succeeded to FSLIC's position as receiver. *See* Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 1989 U.S.Code Cong. & Ad.News (103 Stat.) 183

(*see* § 215, § 401(a), § 401(f)(2), § 501).[2] James W. Smith II filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code on November 4, 1987, and Vernon Smith filed his petition on December 28, 1987.

The complaint concerns three loan transactions by Vernon Savings and Loan Association to Smith entities for projects known in these proceedings as Cedar Springs, Celestial/Montfort and New York Avenue. The debtors, James Smith and Vernon Smith, first cousins, had been engaged in their family's substantial real estate development business. They operated through several entities, known in these proceedings as the Smith entities or companies, most of which were under Landmark Properties, Inc, a holding company. By 1985 the Smith entities faced economic difficulties, as they struggled to pay significant outstanding debt and cash flow deficiencies. The Smith entities owed Vernon Savings over $34,000,000. They owed substantial debt to other lending institutions as well.

Vernon Savings, meanwhile, had its own problems. Shockingly, by 1986 96% of Vernon Savings' portfolio was non-performing. In late 1984 a Vernon Savings subsidiary, Dondi Residential Property, Inc. (DRPI), owned distressed property with loans reflected as assets on Vernon Savings' books. Vernon Savings was principally owned by Don Dixon. Although technically not an officer of Vernon Savings, Dixon functioned as its chief officer. Dixon sat on top of Vernon Savings' organization chart, even as Vernon Savings' organization frequently changed. Dixon made the ultimate decisions on whether to fund loans, how to fund them, and which customers would receive preferential treatment by Vernon Savings.[3] Not unusually, Vernon Savings might enter a loan transaction where it provided 100% of the purchase and development costs and where it agreed to carry and to finance interest in subsequent loans. At Dixon's direction, Vernon Savings would fund loans even if Vernon Savings' underwriters concluded the loans were not prudent.

By 1985 Dixon and the Smiths had developed a working relationship. Having known each other for a number of years in the real estate development business, the Smiths and Vernon Savings engaged in numerous financial transactions. A mutual friend, Jack Atkinson, was also involved in the real estate business. With Atkinson, the Smiths and Dixon interacted socially on occasion. The Smiths invested in Dixon projects. They took hunting trips together in Europe.

By late 1984 Vernon Savings had to move the problem DRPI loans from its books. If the DRPI loans could not be removed from Vernon Savings' books, Vernon Savings faced auditing requirements to write down the value of the loans as assets, resulting in losses for DRPI. The losses would then flow to Vernon Savings thereby adversely effecting Vernon Savings' ability to issue dividends. In December 1984 Dixon decided to sell the DRPI property. A team at Vernon Savings structured the

---

**2.** The FDIC moved this court on November 18, 1989, to substitute, in both adversaries, the FDIC as manager of the FSLIC resolution fund, as receiver for Vernon Savings and Loan Association, FSA, as party in interest for FSLIC, as receiver for Vernon Savings and Loan Association, FSA. The court grants the FDIC's motion. The Smiths argue that the FDIC has not demonstrated that it holds the notes at issue or that a debt arises from those notes. The proofs of claim filed by the receiver on May 4, 1988, to which the FDIC succeeds pursuant to FIRREA, and which were admitted into evidence constitute prima facie evidence of the debts of James and Vernon Smith relating to the loans at issue. 11 U.S.C. § 502(a); Bankruptcy Rule 3001(f). The Smiths did not object to these proofs of claims, and the Smiths were provided with sufficient notice of the existence of the debts through these proofs of claims.

**3.** Don Dixon and Vernon Savings officers Woody Lemons and Andrew Kaplan invoked their privilege under the Fifth Amendment to the United States Constitution to refuse to answer questions about their transactions with the Smiths. The FDIC argues that the court may draw adverse inferences from the silence of these witnesses. The court has not considered their testimony or the invocation of the Fifth Amendment privilege by Dixon, Lemons and Kaplan in making its findings of fact and so need not decide whether drawing inferences from their silence is appropriate in this case.

DRPI property sales to assure a cost recovery for DRPI. The sales price for each DRPI property would equal DRPI's and hence Vernon Savings' investment in the property. By selling the property for the amount of the investment, Vernon Savings books would not reflect a loss. Under this sales structure, Vernon Savings sold the DRPI property at a price greater than the appraised value of the property. To avoid the write down, Vernon Savings had to close the sales transactions by May or June 1985, its year end. Because the sales involved distressed projects but nevertheless carried purchase prices greater than the appraised value, Vernon Savings offered accommodations to attract purchasers. The DRPI property included the Cedar Springs tract.[4]

The Smiths agreed to purchase the Cedar Springs tract. In return, Vernon Savings agreed to finance the entire purchase price, even though greater than the value of the property. By purchasing the Cedar Springs tract, the Smiths secured their status as preferred Vernon Savings customers at a time when they needed financial assistance. Vernon Savings had developed a loan policy by 1985: If a customer participated in a DRPI transaction, at a time when Vernon Savings was having fiscal difficulties, the customer would be eligible for future loans provided each loan passed underwriting muster. If a customer did not participate in a DRPI transaction, the customer would not be considered for future loans. Vernon Savings had a substantial interest in having the Smiths' entities survive because the Smiths owed Vernon Savings over $34,000,000. The Smiths needed Vernon Savings' loans to meet their cash flow problems to keep their 50 year old real estate development business operating.

In May 1985 James, Vernon Smith and James' brother Paul formed Smith Springs Limited Partnership, a Texas limited partnership, for the purpose of acquiring the 6.22 acre Cedar Springs tract of raw land located in Dallas, Texas. The Smiths were the general partners. The Smiths purchased the Cedar Springs tract from DRPI. Vernon Savings financed the purchase. The purchase price exceeded the appraised value of the Cedar Springs tract.

The Smiths followed the standard Vernon Savings loan application procedures. Vernon Savings obtained an appraisal for the Cedar Springs tract before making the loan. The Smiths submitted a standard Vernon Savings loan application. According to the loan application, the loan was for the purpose of "acquisition of 6.2224 acres land for potential future development." The Cedar Springs loan documents reflected that Vernon Savings lent the Smiths funds for the acquisition of the Cedar Spring property. But Vernon Savings' principals and the Smiths understood that the development funds would be provided by subsequent loan transactions. While federal regulators allowed savings institutions to finance 100% of a commercial real estate deal, including interest payments, carrying costs and loan-origination fees, it was outside the lending norm for borrowers and the lending institutions to have loan purposes other than those stated on the loan documents. The Smiths had, however, fully disclosed to Vernon Savings their cash flow and other financial problems. Because of a deteriorating market

---

4. At trial the Smiths objected to the introduction of evidence of DRPI transactions other than the specific Cedar Springs transaction. The Smiths contend that the FDIC had denied them discovery on other DRPI transactions on relevancy grounds. They argue that the FDIC discovery relevancy objection should carry through to the trial. The court has excluded evidence or has not considered evidence of other specific DRPI transactions. However, evidence of the overall DRPI sales structure is relevant for an understanding of the Cedar Springs transaction.

The FDIC asks the court to admit into evidence a deposition of Don Dixon by Westwell, Inc., as an exception to the hearsay rule under Fed.R.Evid. 804(b)(1) or 804(b)(5). The Smiths object, saying that Westwell, a corporate debtor which purchased a condominium project from Dondi Residential Properties, Inc., (DRPI), and which questioned Dixon about this DRPI transaction, is not a "predecessor in interest" of the Smiths. The Smiths also argue that evidence of the Westwell transaction is not relevant. The court has not admitted specific evidence of other DRPI transactions and sustains the Smiths' objection on the basis that the Westwell deposition is not relevant.

and the Smiths' financial difficulties, the Smiths and Vernon Savings' principals knew that the Cedar Springs tract could not be developed for apartments or condominiums in 1985 or 1986. Vernon Savings agreed that the proceeds of the Cedar Springs loan could be used by the Smiths to cover cash flow and other financial shortages in various Smith entities.

The loan documents provided for a 10.75% interest rate to be paid semi-annually. The Smiths expected that the interest would be paid by Vernon Savings through a subsequent construction loan. Vernon Savings had given James Smith a verbal commitment to fund a construction loan for the Cedar Springs property. In addition, the Smiths had an oral understanding with Vernon Savings' senior officials that they would attempt to syndicate through a joint venture or a Vernon Savings subsidiary the Cedar Springs property. They had a joint game plan for Vernon Savings to repurchase the property if Vernon Savings could not fund a construction loan on the property or the Smiths would build an apartment complex on the property and sell it through a joint venture with Vernon Savings or to a Vernon Savings subsidiary or syndicate it through a Dixon-related group. But in any event, the Smiths had an oral commitment from Vernon Savings for a construction loan that would include carrying or paying outstanding interest. The Smiths intended to ultimately develop the Cedar Springs property consistent with that understanding.

Smith Springs Limited Partnership purchased the Cedar Springs property for $5,582.456. Vernon Savings' appraisal established a market value for the property of $5,425,000.[5] To avoid questions by any lending institution examiner, the loan closing statement did not reflect that the amounts that Vernon Savings loaned to Smith Springs Limited Partnership exceeded the appraised value of the Cedar Spring property.

On May 22, 1985, Vernon Savings and Smith Springs Limited Partnership executed a first lien note in the amount of $4,340,000, a second lien note in the amount of $1,085,000, and an unsecured note in the amount of $170,000. San Jacinto Savings Association purchased the first lien. Upon default, San Jacinto foreclosed on its first lien. The FDIC did not receive any payment from the San Jacinto foreclosure. The Smiths owe the FDIC $1,085,000 principal plus interest on the Cedar Springs loans.

As 1985 continued, the Smith companies continued to suffer economic difficulties. They engaged in minimal construction activity. Their Vernon Savings loans were in arrears. Vernon Savings knew of the Smiths' financial difficulties. Vernon Savings assigned loan officers to work with the Smiths to restructure their debts.

The Smiths realized their companies needed a major restructuring. The Smith companies' cash flow could not carry their substantial overhead and pay debt service although the Smiths believed that over the long term they could realize equity from their various projects. Vernon Smith decided that he had had enough; he wanted to engage in a simpler business. Landmark Properties and the other Smith entities could not support the salaries of the three Smiths. The companies needed an overhead reduction to survive. James Smith, however, wanted to continue to own, develop and operate Landmark Properties and the Smith entities. Vernon Smith agreed to sell his one-third stake in Landmark to James Smith. Vernon Smith would receive consideration roughly equal to six months of his salary and James Smith would arrange to obtain a release of Vernon Smith's personal debt. Vernon Smith could not or would not testify about the consideration he actually received. James Smith thereafter worked with Vernon Savings, Guardian Savings and Loan Association of Houston, Texas, and other

---

**5.** At trial, the FDIC questioned the accuracy of that appraisal. The actual value of the property at the time of the transaction need not be established or found as part of these findings. Rath- er, even accepting the appraisal at face, the Smiths and Vernon Savings entered a loan transaction for more than 100% of the appraised value.

lending institutions to restructure the Smith companies' debts.

The Smith companies continued to suffer substantial negative monthly cash flows and James Smith worked with Vernon Savings to secure financing for his cash flow and overhead deficiencies. To overcome the cash flow problems, the Smiths and their entities obtained a number of unsecured loans from Vernon Savings totaling $1,200,000.

In addition, in 1985, the Smiths were experiencing difficulties in paying loans owed to Guardian on a project known as "Celestial/Montfort." In the fall of 1985 James Smith approached Vernon Savings with a proposition that Vernon Savings refinance the Guardian loan on Celestial/Montfort and fund the operating expenses of his various business entities.

James Smith also discussed the New York Avenue property with Dixon. Dixon needed a loan participant for Vernon Savings to finance the New York Avenue purchase. James Smith then discussed the New York Avenue property with Guardian. Guardian required that the New York Avenue property stand alone as a prudent transaction. But, in addition, Guardian required that any Celestial/Montfort refinancing be connected with the New York Avenue purchase whereby Guardian would participate but would be the first participant taken out.

James Smith, through Conworth Properties Inc., applied for a Vernon Savings loan to refinance the Celestial/Montfort property, located in Dallas and purchase the New York Avenue property in Arlington, Texas. On April 11, 1986, James Smith incorporated Conworth Properties Inc, a Texas corporation. He capitalized Conworth with $1,000. James Smith was Conworth's president and sole shareholder. On the loan applications Conworth would be the borrower.

In the Celestial/Montfort loan application, James Smith stated the purpose of the loan was "carry land prior to build-out (within one year)." In the New York Avenue loan application, Smith stated the purpose of the loan was "acquisition of land, construction of infrastructure, interest carry, etc." The Vernon Savings underwriter understood that the Celestial/Montfort loan proceeds would be used to hold the property for one year, thereby enabling James Smith to refinance his debt with Guardian. Vernon Savings' underwriter understood that the New York Avenue loan proceeds would be used to fund the purchase and holding of that property, including the payment of taxes and insurance but that no construction would occur. James Smith, however, had explained to Vernon Savings' senior officers and to Dixon, that the loan funds would also be used to carry the Smith companies operating expenses including cash flow and salaries. James Smith's own salary ran over $200,000 a year, despite the Smith entities' financial difficulties and restructuring. The underwriter did not know of these additional uses of the loan proceeds. These additional uses were not stated on the loan applications. However, prior to approving and funding the loans, senior Vernon Savings officials knew and approved of the use of the loan proceeds to pay overall Smith companies' operating expenses and personal salaries.

Vernon Savings obtained an appraisal on the New York Avenue property of $18,900,000 if developed and $17,500,000 "as is" raw land.[6] A review by a different appraiser in March 1986 reflected a $15,700,000 market value. Vernon Savings' underwriter agreed with the lower appraisal. The actual purchase price of the New York Avenue property was $8,000.000. The parties did not present evidence at trial explaining the purchase price. Thus, despite the Smith companies' financial difficulties, because of the equity cushion, the under-

6. At trial, the FDIC questioned the accuracy of that appraisal. Vernon Savings' underwriter questioned its accuracy when made. The underwriter accepted the lower value set by the reviewing appraiser at the time of the transaction. The underwriter, an FDIC-approved underwriter, was a credible witness and the court accepts his assessment of the value of the property at the time of the loan.

writer concluded that a $15,700,000 New York Avenue loan, to be funded on draw requests, would be a prudent lending institution transaction.

On April 26, 1986, Conworth purchased the 110.261–acre tract of land abutting New York Avenue in Arlington. Vernon Savings financed the transaction with a $15,750,000 wrap around loan, to be funded upon written draw requests. Vernon Savings could refuse to fund a draw request. James Smith personally guaranteed the New York Avenue loan. Vernon Smith did not personally guarantee the New York Avenue loan.

From April 1986 through February 1987, James Smith submitted draw requests on the New York Avenue loan to cover interest payments, to pay the outstanding $1,200,000 unsecured loans the Smiths had with Vernon Savings, and to finance the Smith companies' overhead and operating expenses and James Smith's salary. Together with the purchase price of the land, the total drawn on the New York Avenue loan was $12,179,964.00. Vernon Savings agreed to reserve funds for future use. All funding was done upon written draw request.

Vernon Savings did not include on the loan documents, such as the loan budget, the loan committee approval or Board minutes that a portion of the New York Avenue proceeds would be used to pay unsecured loans, operating expenses, Smiths' salaries and other overhead. Vernon Savings had continuing concerns that lending institution regulators or examiners not be alerted to any of Vernon Savings' problems. However, the New York Avenue loan documents did not state how the unallocated funds would be used, or limit the use of the funds to a particular purpose. The appraised value of the property accepted by Vernon Savings' underwriter exceeded the total sum drawn on the loan.

Vernon Savings financed the Celestial/Montfort loan even though its underwriter concluded that the Celestial/Mont-

fort package did not constitute a prudent loan. Vernon Savings' appraisal of the Celestial/Montfort property came in at $8,900,000.[7] James Smith, through Conworth, sought an $8,010,000 loan. Vernon Savings' underwriter concluded that the property was worth less than the $8,010,-000. The real estate market continued to deteriorate. The Smith companies' financial condition meant that James Smith was no longer credit worthy. Without an equity cushion like that in the New York Avenue loan, the underwriter, the loan officer and his supervisor did not approve the Celestial/Montfort application. The loan would be inconsistent with federal regulations and would create continuing financial difficulties for the distressed Smiths, notwithstanding that the Smiths were long standing Vernon Savings customers, that Vernon Savings could continue to work with them, and that Vernon Savings was aware of their cash flow problems. Despite these negative recommendations, Vernon Savings approved the Celestial/Montfort transaction as well as the New York Avenue loan. Dixon directed that the loans be approved. On April 11, 1986, Conworth purchased the ten acres at the corner of Montfort and Celestial in Dallas, Texas. Vernon Savings financed the transaction with an $8,010,000 wrap around loan. James Smith personally guaranteed the loan. Vernon Smith did not personally guarantee the loan.

Guardian was the lending participant on both the New York Avenue and Celestial/Montfort transactions. Guardian funded $9,450,000 of the New York Avenue loan and $6,000,000 of the Celestial/Montfort loan. Guardian participated in the New York Avenue loan with certain favorable conditions including a first out repayment provision. Vernon Savings agreed to wrap its loans on the New York Avenue and Celestial/Montfort properties. Vernon Savings gave Guardian an unconditional takeout commitment to repay within one year the $6,000,000 underlying loan on Ce-

---

7. At trial, the FDIC also questioned the accuracy of this appraisal. Vernon Savings' underwriter did not accept this value and recommended the loan application be denied as undersecured. The court finds his testimony credible and entitled to significant weight.

lestial/Montfort in the event the borrower defaulted. Vernon Savings approved this arrangement. The arrangement with Guardian was not consistent with customary practices of thrift institutions and was not a typical loan structure, but while the structure violated acceptable lending institution practices between institutions and with the regulators, that violation does not bear on the discharge of the Smiths' debts.

According to the Vernon Savings loan officers, Dixon gave the ultimate direction to the Vernon Savings' employees to approve the Celestial/Montfort and New York Avenue transactions. Vernon Savings' senior officers allowed James Smith to use funds from Celestial/Montfort and New York Avenue loans to pay his salary, to provide income for Vernon Smith and to cover operating expenses of various Smith entities. That was part of the transaction. The uses had been disclosed to Vernon Savings, discussed with Vernon Savings, and approved by Vernon Savings. By funding the Celestial/Montfort and New York Avenue loans, Vernon Savings fulfilled its end of the accommodation made with the Smiths when they purchased the Cedar Springs property.

On the Celestial/Montfort loan, upon written draw requests, Vernon Savings released loan funds to finance the Smith companies' overhead and operating expenses and pre-development costs totaling $987,000. Vernon Savings funded draw requests to pay overhead and pre-development costs of $637,000 on the New York Avenue loan even though the property was not being physically developed by James Smith. James Smith used that money to pay the operating expenses of his companies, including his salary, believing that if his companies survived that he would ultimately develop the property. James Smith thus saw these payments going ultimately toward development.

The appraised value of the Celestial/Montfort property did not fully secure the loan to hold the property after paying the Guardian obligation and paying operating expenses for the Smith companies. Unlike the New York Avenue loan, therefore, the Celestial/Montfort loan could not stand on its own as a prudent secured transaction. Further, payment of development fees were not supported by the loan documents, were not secured by the value of the property and did not fund actual physical development of the property.

The outstanding principal debt on the New York Avenue loan is $12,179,964.68. Unpaid interest has accrued in the amount of $4,335,240.92. The FDIC has not recovered on this debt. The outstanding principal debt on the Celestial/Montfort loan is $1,586,236.36. Total interest collected was $117,294.70. The property has been foreclosed with one dollar being credited toward the account. Outstanding unpaid interest is $225,541.10. These figures are all as of October 10, 1989.

At trial, after the FDIC rested, on Vernon Smith's motion, the court granted judgment for Vernon Smith discharging any debt he had to the FDIC, if any, under the New York Avenue and Celestial/Montfort loans. Conworth was the borrower on those loans. James Smith was Conworth's president and sole shareholder. James Smith guaranteed the loans. Vernon Smith had disengaged from the Smith companies at the time of those transactions. He was neither a borrower or guarantor. The court denied James Smith's motion for judgment and Vernon Smith's motion for judgment on the Cedar Springs transaction.

## DISCUSSION

The FDIC seeks to exclude from the Smiths' discharges the outstanding balance on the Cedar Springs, Celestial/Montfort and New York Avenue loans, alleging that the Smiths conspired with officers of Vernon Savings and its principal owner, Don Dixon, to deceive the bank regulators and so violated § 523(a)(2)(A). A debt will not be discharged under § 523(a)(2)(A) if 1) the debtor made false representations, 2) with the intent and purpose of deceiving the creditor, 3) the creditor reasonably relied on the representations, and 4) the creditor sustained a loss as a result of the representations. *Matter of Church*, 69 B.R. 425, 432 (Bankr.N.D.Tex.1987).

Conspiracy may be proven by circumstantial evidence, and requires that a conspirator have knowledge of the object of the conspiracy and intent to injure. *In re Jones*, 50 B.R. 911, 921 (Bankr.N.D.Tex. 1985).

The Bankruptcy Code provides an honest debtor with a fresh start, free from the burden of past debts. *Brown v. Felsen*, 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1979). A court does not lightly except a debt from discharge. The burden of proof to apply in § 523 actions, either that of clear and convincing evidence or of preponderance of the evidence, is unsettled in the Fifth Circuit. *In re Stowell*, 102 B.R. 589, 596 (Bankr.W.D.Tex. 1989) (The court reviewed the unsettled history of the choice of standard of proof in § 523 actions and held that the proper standard should be proof by a preponderance of the evidence.) This court finds that the evidence presented by the FDIC satisfies both standards for the debts arising from the Cedar Springs and Celestial/Montfort loans, but the FDIC's evidence does not satisfy the lesser preponderance of the evidence standard for the New York Avenue loan.

## CEDAR SPRINGS

The Smiths purchased the Cedar Springs property at a time when their companies had serious financial difficulties. The Smiths stated on the loan applications submitted for Cedar Springs that the purpose of the loans was "acquisition ... of land for potential future development." But the Smiths omitted the other material purpose to receive future financial assistance from Vernon Savings.

In addition to expecting future financial assistance in return for purchasing Cedar Springs, the Smiths expected that Vernon Savings would loan them the money needed to pay the interest and carrying charges on the Cedar Springs loans until the property could be developed and sold to a third party or back to Vernon Savings or to a Vernon Savings subsidiary. The Smiths and Vernon Savings structured the Cedar Springs purchase and represented that purchase, at the time the loans were made, in a manner calculated to deceive the lending institution examiners. The Smiths paid $5,582,456 for Cedar Springs although appraised at only $5,425,000. The purchase price covered DRPI's investment in the property, and thus permitted DRPI, and consequently Vernon Savings, to avoid the negative effects of showing a loss for the property. Vernon Savings loaned the Smiths the Cedar Springs purchase price in the form of three loans: two of the loans, a first lien note of $4,340,000 and a second lien note of $1,085,000, were recorded on the loan closing statement, received loan committee approval and were placed in the loan closing binder. These loans together amounted to 100% of the appraised value. Vernon Savings at the same time loaned the Smiths $170,000 through an unsecured promissory note. Vernon Savings and the Smiths concealed from the lending institution examiners the existence of the $170,000 loan by not recording the loan on the Cedar Springs closing statement, seeking loan committee approval or placing the promissory note in the loan closing binder. In this manner Vernon Savings and the Smiths concealed from any lending institution examiner the fact that Vernon Savings had loaned the Smiths more than 100% of the property's value in consideration for the Smiths' purchase of Cedar Springs from DRPI, in violation of lending norms. The Smiths and Vernon Savings falsely represented in the loan documents in the closing binder that the Smiths were loaned only 100% of the property's appraised value by omitting mention of the $170,000 loan on the loan closing statement and by omitting the $170,000 unsecured promissory note from the loan closing binder.

The Smiths, sophisticated borrowers, knowingly aided Vernon Savings in structuring the Cedar Springs loans in a manner calculated to deceive lending institution examiners. The Smiths knowingly deceived the lending institution examiners about the side agreements which the Smiths expected would transfer the risk of an imprudent loan to Vernon Savings. The Smiths and Vernon Savings conspired to deceive the lending institution examiners about the

true purposes and amount of the Cedar Springs loans.

■ The court does not hold that side agreements constitute fraud as a matter of law or prevent a discharge of a debt to a solvent lending institution. The Smiths knew, however, that the Cedar Springs purchase was not prudent. In the deteriorating real estate market, no development was in prospect. The Smiths knew that the real, ultimate purpose of the Cedar Springs transaction, which was not reflected on the loan applications, was to permit Vernon Savings to avoid recording a loss in exchange for a promise of future financial assistance to the financially strapped Smiths. The Smiths knowingly cooperated with Vernon Savings in concealing the side agreements from the loan documents. The Cedar Springs loans would not have been made absent the side agreements and understandings between Vernon Savings and the Smiths and would not have been made had the conspirators not structured the loans to deceive the lending institution examiners about the full loan amount. The deceptions practised by Vernon Savings and the Smiths are thus material and resulted in the subsequent debt.

Vernon Savings, as co-conspirator with the Smiths, could not sustain against the Smiths an action under § 523(a)(2)(A) because Vernon Savings could not show it reasonably relied on the deceptive closing statement and loan applications. However, the FDIC need not show actual reliance. The FDIC as receiver may, as a matter of law, reasonably rely on the documents in the loan file contemporaneous with the making of a loan, such as the closing statement, loan application, loan committee approvals and the minutes of the meeting of the Board of Directors. *See D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *see also Beighly v. Federal Deposit Ins. Corp.*, 868 F.2d 776, 784 (5th Cir.1989) ("The test for the application of the *D'Oench, Duhme* doctrine is whether the borrower 'lent himself to a scheme or arrangement' whereby banking authorities are likely to be misled." (citing *D'Oench, Duhme*, 315 U.S.

at 460, 62 S.Ct. at 680); *see also Langley v. FDIC*, 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 ("The statutory requirements [of 12 U.S.C. § 1823(e)] that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of loan terms by bank officials and borrowers (whose interests may well coincide when a bank is about to fail)"); *In re Pernie Bailey Drilling Company, Inc.*, 111 B.R. 565 (Bankr.W.D.La.1990); *In re Stefanoff*, 106 B.R. 251, 256 (Bankr.N.D. Ok.1989); *In re Cerar*, 97 B.R. 447, 449 (C.D.Ill.1989); *In re Figge*, 94 B.R. 654, 668 (Bankr.C.D.Cal.1988); *In re Boebel*, 79 B.R. 381, 384 (Bankr.N.D.Ill.1987).

The Smiths knowingly cooperated with Vernon Savings in making false representations to the lending institution examiners, the examiners were entitled to rely as a matter of law on the misleading loan documents, and the false representations resulted in the making of an imprudent loan and the subsequent debt. The Smiths intended to and did injure the insurers of Vernon Savings. The debt arising from the Cedar Springs loan is therefore nondischargeable under § 523(a)(2)(A).

## CELESTIAL/MONTFORT

In the fall of 1985 James Smith had difficulty paying the existing loan from Guardian on the Celestial/Montfort property and also needed money to fund the operating expenses of his various business entities. James Smith applied for a Vernon Savings loan to refinance the Celestial/Montfort property through Conworth Properties, Inc. James Smith had incorporated Conworth on April 11, 1986, with $1,000 and was Conworth's president and sole shareholder. James Smith concedes that Conworth was his alter ego. Vernon Savings financed the Celestial/Montfort loan, at Dixon's direction, even though Vernon Savings' underwriter concluded that the Celestial/Montfort package did not constitute a prudent loan. James Smith, through Conworth, applied for an $8,010,-

000 loan, and James Smith personally guaranteed the loan. Vernon Savings' appraised the Celestial/Montfort property at $8,900,000. Vernon Savings' underwriter did not accept this value, concluded that the loan requested exceeded the value of the property and recommended the loan application be denied as undersecured. The court finds his testimony credible and entitled to significant weight. The $8,010,000 wrap around loan financed by Vernon Savings was undersecured and imprudent when made.

■ The purpose of the Celestial/Montfort loan as stated in the loan application was to "carry land prior to build-out (within one year)." In fact, the loan was to also supply working capital to James Smith's other properties and to pay salaries. The refinancing by Vernon Savings of Celestial/Montfort represented the return favor to James Smith for the Smiths' purchase of Cedar Springs. Vernon Savings would not have refinanced Celestial/Montfort absent the earlier mutual agreement to accommodate each other which underlay the Cedar Springs transaction. Neither James Smith nor Vernon Savings disclosed the real reason Dixon insisted that Vernon Savings finance the imprudent Celestial/Montfort loan, nor did they disclose on the loan documents in the closing binder, such as the loan application, the loan committee approval or the board minutes, the intended uses of the loan funds at the time the loan was made. The uses of Celestial/Montfort funds for purposes other than that disclosed on the loan application and approved by the loan committee had been disclosed by James Smith to Vernon Savings, discussed with Vernon Savings, and approved by Vernon Savings. However, this disclosure and approval, this agreement between James Smith and Vernon Savings, was concealed from lending institution examiners. James Smith knew that the loan application concealed the intended uses of the Celestial/Montfort loan which constituted the fulfillment by Vernon Savings of its end of the accommodation made with the Smiths when they purchased the Cedar Springs property. James Smith knew he and Vernon Savings were misleading the lending institution examiners about the full actual uses of the Celestial/Montfort loan proceeds. James Smith knew when he applied for the loan that he intended to use the proceeds for operating expenses and he concealed this intended use from the loan application.

The written draw requests which document the use of funds for developer's overhead, for pre-development costs and for special general and administrative costs do not alter the initial deception which characterized the purpose of the Celestial/Montfort loan as being "Carry land prior to build-out (within one year)." The loan supplied working capital to James Smith's other properties and entities and funded land acquisition for Celestial/Montfort. The Smiths and Vernon Savings concealed the former purpose. Since Vernon Savings could not make a prudent loan on this transaction for the stated purpose, this deception constitutes a fraud upon the government insurance program put at risk by a deceptive practice which conceals the true use of loan proceeds. Ordinarily, operating and other overhead expenses and pre-development costs or fees financed by a loan would be limited to the specific project covered by the loan. Here the loans funded all the Smith companies and personal salaries. The court cannot accept as credible the testimony that funding all operating expenses for a specific "acquisition and hold" loan constitutes an industry norm. In fact, with each draw request, James Smith filed an affidavit which stated that all funds advanced by Vernon Savings to Conworth for use in connection with the development of Celestial/Montfort have been applied to the payment of obligations due by Conworth for materials, labor and other costs incurred in connection with that construction, and for no other purpose. The court does accept that on occasion a solvent lending institution with a course of dealing with a solvent developer reflecting timely debt service will make an overall developer working capital loan secured by a specific property or development. Lending institutions make working capital loans to fund company operations. This case

does not involve working capital loan applications. This case does not involve a solvent lender or a solvent borrower. This transaction does not involve a prudent loan regardless of the purpose because it was undersecured. The misleading draw requests on the Celestial/Montfort loan further support the inference that James Smith and Vernon Savings intended to deceive the lending examiners about the stated purpose of the loan at the time the loan was made.

James Smith intended to and did injure the insurers of Vernon Savings. James Smith knowingly cooperated with Vernon Savings in falsely representing to the lending institution examiners the intended use of funds from the Celestial/Montfort loan. The lending institution examiners were entitled to rely on the truth of the documents stating the purpose of the loan. The false representations by James Smith and Vernon Savings resulted in the imprudent loan of $8,010,000 to James Smith and the debt arising from the loan is nondischargeable under § 523(a)(2)(A).

The Smiths have raised as an affirmative defense allegations that the FDIC failed or refused to fund the interest owing to Guardian on its first lien under the terms of the Tri–Party Agreement relating to Celestial/Montfort, and that the FDIC's action triggered defaults on the Cedar Springs and New York Avenue loans. The debtors have not substantiated these allegations through the presentation of evidence at trial and thus their affirmative defense is dismissed. The Smiths also asserted that the FDIC is estopped from alleging misapplication of funds because the FDIC controlled Vernon Savings when the funds were applied by the Smiths. The evidence shows that the FDIC did not acquire control of Vernon Savings until after the last draw request was funded in October, 1986.

The FDIC has also alleged a violation of § 523(a)(6) for the Cedar Springs and Celestial/Montfort debts. Since the court holds the debts arising from the Cedar Springs and Celestial/Montfort loans nondischargeable under § 523(a)(2)(A), the court need

not decide whether James Smith violated § 523(a)(6) on these debts.

## NEW YORK AVENUE

The circumstances and loan documents of the New York Avenue loan do not support a finding of fraud by James Smith under § 523(a)(2)(A). The New York Avenue loan and advances made on that loan were prudent. The underwriter of the New York Avenue loan valued the property at the time of the transaction at $15,700,-000. The court has accepted his assessment of the value of the property at the time of the transaction as credible. James Smith applied for and Vernon Savings approved a loan of $15,750,000 for the purpose of "acquisition of land, construction of infrastructure, interest carry, etc." Vernon Savings disbursed a total of $12,179,-964.00 on the New York Avenue Loan and reserved the remaining funds. A substantial equity cushion remained between the accepted appraised value and the total drawn on the loan. James Smith and Vernon Savings had no need to deceive the lending examiners about the purpose or use of the New York Avenue loan because the loan was prudent.

Even if the court found that Vernon Savings and James Smith intended to and did deceive the lending examiners about the purpose of the loan disbursements, the court could not find that deception to be material and the cause of harm to the FDIC as receiver because the funding of the loan was prudent based on the parties' knowledge of real estate values at the time the loan was funded. The subsequent collapse in real estate values, rather than the funding of the New York Avenue loan, caused the outstanding debt on the New York Avenue loan. Unlike the other loans, had the market been stable the debt would have been satisfied by the collateral.

Further, the evidence does not support a finding that Vernon Savings and James Smith deceived the lending institution examiners about the purpose and use of the New York Avenue loan funds on the loan application. James Smith's loan application left unspecified the exact purpose of the

loan. The development budget in the loan closing binder contains a line item for "unallocated funds" in the amount of $1,637,-238.00. Paragraph 2.08 of the New York Avenue loan agreement reserves to Vernon Savings the right to advance to James Smith funds "for such other purposes ... as Lender may, in its sole discretion, deem necessary or advisable." The loan application itself is ambiguous. In these statements, the parties did not falsely represent the New York Avenue loan to have been made for a specific, narrow purpose. Unlike Cedar Springs and Celestial/Montfort, the loan documents left the purpose of the loan ambiguous and open ended.

Vernon, James and Paul Smith had obtained unsecured loans from Vernon Savings in the amount of $1,200,000.00 to finance the Smith companies' cash flow problems prior to the receipt of the New York Avenue loan. The court finds no intentional false representation in the use of the New York Avenue loan proceeds to pay off $1,200,000.00 in unsecured loans, because of the open ended statements of purposes in the loan closing binder documents.

James Smith did submit written draw requests for funds for "developer's overhead" which Smith and Vernon Savings both knew would be applied generally to the Smith companies' operating expenses, to James Smith's salary and to remaining income payments to Vernon Smith. James Smith submitted affidavits with the draw requests which stated that the funds requested represented items due by Smith for labor, materials and other costs incurred in connection with the construction of the New York Avenue development. The affidavits contain false representations about the draw requests because all the loan proceeds were not used for New York Avenue development. While the affidavits and draw requests were therefore misleading to anyone other than Vernon Savings or James Smith, the court, in light of its finding that the funding of the New York Avenue loan was prudent, does not find that the misleading nature of the draw requests caused the subsequent debt.

The FDIC has argued that James Smith misapplied the loan proceeds from New York Avenue to pay personal expenses or to pay expenses unrelated to improvements on New York Avenue. The FDIC cites cases in support of its proposition that misapplication of funds is fraud as a matter of law. *See In re Jones,* 50 B.R. 911 (Bankr. N.D.Tex.1985); *In re Self,* 51 B.R. 686 (Bankr.N.D.Miss.1985); *In re Miller,* 5 B.R. 424 (Bankr.W.D.La.1980). However, in those cases the creditor was actually deceived about the misapplication which occurred. The cases do not stand for the proposition that misapplication constitutes fraud as a matter of law. In addition, in those cases the misapplication caused the debt. In this case, Vernon Savings knew that James Smith applied funds from the draw requests towards personal salary and the Smith companies' operating expenses. Vernon Savings had not been deceived by James Smith. Because of the equity cushion acknowledged to exist by the underwriter and which Vernon Savings preserved on New York Avenue, Vernon Savings acted prudently in funding the draw requests. The FDIC has not established that James Smith's deception of the lending institution examiners by the New York Avenue draw request affidavits caused the debt.

Like the Celestial/Montfort loan, the New York Avenue loan represented the return favor to James Smith for the Smiths' purchase of Cedar Springs. And like Celestial/Montfort, James Smith's draw request affidavits limit use of funds to the specific project when in fact the funds paid in part Smith Company operating expenses. But unlike the Celestial/Montfort loan, the New York Avenue loan was fully secured. Unlike the Celestial/Montfort loan, the New York Avenue loan had open ended purposes. Unlike the Celestial/Montfort loan, the New York Avenue loan was not fully funded. Unlike Celestial/Montfort therefore, the New York Avenue loan had an equity cushion for Vernon Savings when funded. Unlike the Celestial/Montfort loan, the New York Avenue loan was prudent when made. Consequently, the FDIC has not met its

burden of proof to have the New York Avenue debt excepted from discharge under § 523(a)(2)(A).

■ The FDIC asserts that the debt arising from the New York Avenue loan is nondischargeable under § 523(a)(6). Under § 523(a)(6), a debtor is not discharged "from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "Willful" means deliberate or intentional and "malicious" means without just cause or excuse. *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480, 486 (5th Cir.1986). A finding of malice does not require a finding of specific intent to do harm. *In re Dean*, 79 B.R. 659, 662 (Bankr.N.D.Tex.1987). However, although specific intent to injure is not required, this court looks to whether an intentional act necessarily causes harm and is without just cause or excuse; i.e., did the debtor know, or reasonably should have known that his unjustifiable act would harm the plaintiff or property of the plaintiff? *See In re Shah*, 96 B.R. 290, 295 (Bankr.C.D.Cal.1989). The evidence does not establish that James Smith deceived, intentionally or otherwise, the FDIC about the purpose of the New York Avenue loan at the time the loan was made because the purpose was ambiguous. The draw requests do not establish intent to deceive the FDIC at the time the loan was made or when the draw requests were submitted. Since the New York Avenue loan was prudent when made, and the draw requests were fully secured when funded, the FDIC has not established that James Smith, in his loan application or by his draw requests, intended to act in a manner which he knew or should have known would injure the FDIC. Similarly, the FDIC has not established the element of malice or no just cause, because the New York Avenue loan was prudent, the draw requests were fully secured when funded, and thus harm to the FDIC did not necessarily follow from Smith's use of the New York Avenue loan

funds.[8] The FDIC has not shown that but for the affidavits submitted with the draw requests, the draw requests would not have been funded.

### CONCLUSION

The conspiracy between the Smiths and Vernon Savings to deceive the examiners represents a classic example of the pursuit of short term profit at the expense of magnifying the long term collapse of a savings and loan and borrower. The Smiths and Vernon Savings demonstrated an intent to injure and did injure the FDIC by concealing from any examiners the real purpose of two of their loan arrangements. Don Dixon and Vernon Savings benefitted by temporarily hiding the loss which Cedar Springs represented, and Vernon Savings even gained in the short term on its deception by awarding itself loan origination fees and points on the loan to James Smith. Vernon Savings similarly earned short term profits from the Celestial/Montfort transaction by charging loan origination fees and points on a loan that should never have been made. James Smith benefitted by staving off his impending bankruptcy while paying himself a salary of $200,000.00. Vernon Smith benefitted by staving off his impending bankruptcy while obtaining through the Smith entities consideration for his separation from the Smith companies. Both Smiths obtained financing for their troubled companies by obtaining favored status with Vernon Savings. The great risk of failure in these loans, and ultimately of the savings and loan which made them, was borne by the insurers of Vernon Savings, the FDIC and ultimately the taxpayers.

Sophisticated real estate developers who participate in loans that are not prudent with financially troubled federally insured lending institutions and conspire to hide the true nature and purpose of the imprudent loans from federal examiners cannot have the resulting debts to the federal receiver

---

**8.** The court does not excuse or address any other issues concerning false representations in affidavits. The court only finds that the FDIC has not established that the false representations supporting draw requests on the New York Avenue transaction caused the debt under either § 523(a)(2)(A) or (a)(6).

for the failed institution discharged in bankruptcy.

## ORDERS

IT IS THEREFORE ORDERED that the debt of James W. Smith II to the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, for $1,085,000 plus interest at the contractual rate until entry of judgment is not discharged pursuant to 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that the debt of James W. Smith II to the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, for $1,586,236.36 plus interest at the contractual rate until entry of judgment ($225,541.10 through October 10, 1989) is not discharged pursuant to 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that the debt of James W. Smith II to the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, arising from the New York Avenue loan is discharged.

IT IS FURTHER ORDERED that the debt of Vernon B. Smith, Jr., to the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, for $1,085,000 plus interest at the contractual rate until entry of judgment is not discharged pursuant to 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that the debts of Vernon B. Smith, Jr., to the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, if any, arising from the Celestial/Montfort and New York Avenue loans are discharged.

IT IS FURTHER ORDERED that the FDIC as manager of the FSLIC Resolution Funds, as receiver for Vernon Savings and Loan Association, FSA's motion for partial summary judgment is DENIED as moot.

IT IS FURTHER ORDERED that the motions to substitute the FDIC as manager of the FSLIC Resolution Fund, as receiver for Vernon Savings and Loan Association, FSA, as party in interest for FSLIC, as receiver for Vernon Savings and Loan Association, FSA, are GRANTED.

The court will enter judgments for these amounts. The judgments shall bear interest at the rate established by 28 U.S.C. § 1961.